ITEK CORPORATION, Plaintiff,
Appellee,

v.

The FIRST NATIONAL BANK OF
BOSTON, Defendant, Appellee.

Bank Melli Iran, Defendant, Appellant.

ITEK CORPORATION, Plaintiff,
Appellee,

v.

The FIRST NATIONAL BANK OF
BOSTON, Defendant, Appellant.

Nos. 82–1631 to 82–1633.

United States Court of Appeals,
First Circuit.

Argued Dec. 9, 1982.

Decided March 29, 1983.

Petition for Rehearing Denied
May 2, 1938.

Michael F. Hertz, Appellate Litigation Counsel, Civil Div., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., and William F. Weld, U.S. Atty., Boston, Mass., were on brief, for the United States.

Greg A. Danilow, New York City, with whom Daniel P. Levitt, Alan R. Friedman, Kramer, Levin, Nessen, Kamin & Soll, New York City, William A. Zucker, and Gadsby & Hannah, Boston, Mass., were on brief, for Bank Melli Iran.

E. Susan Garsh, Boston, Mass., with whom Thomas H. Walsh, Jr., Rory FitzPatrick, and Bingham, Dana & Gould, Boston, Mass., were on brief, for The First National Bank of Boston.

Thomas D. Edwards, Boston, Mass., with whom Andrew M. Higgins, and Chaplin, Casner & Edwards, Boston, Mass., were on brief, for Itek Corp.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

This is an appeal by defendants First National Bank of Boston and Bank Melli Iran from a judgment and orders of the United States District Court for the District of Massachusetts. Although the proceedings below are extended and complex, the issues that we deem dispositive are relatively narrow. They involve the validity and applicability to this case of a regulation promulgated after the district court's judgment that withdraws the court's authority to render that judgment.

## Background and Proceedings Below

The dispute between the parties concerns the validity of demands made on three standby letters of credit issued for Itek Corporation (Itek) by First National Bank of Boston (FNBB) in favor of Bank Melli as beneficiary. The facts are set out in detail in the opinion of the district court granting Itek a preliminary injunction against payment of the letters of credit. *See Itek Corp. v. First National Bank of Boston,* 511 F.Supp. 1341 (D.Mass.1981). In brief, the facts are as follows.

In April of 1977, Itek entered into a contract with the Imperial Government of Iran for the manufacture of certain high technology optical equipment at an agreed price of $22,500,000. Under the contract, Itek was required to furnish the Imperial Government with four bank guarantees, each in the amount of $1,125,000 issued by an Iranian bank, naming the Imperial Ministry of War as beneficiary. The guarantees were intended to secure, in the event of premature termination of the contract, Itek's repayment of a $4,500,000 advance by the Imperial Government. The contract also required Itek to furnish another bank guarantee in the amount of $2,250,000 also issued by an Iranian bank and naming the Ministry of War as beneficiary, securing Itek's good performance of its contractual obligations.

Itek procured the required guarantees from defendant Bank Melli, a wholly-owned instrumentality of the Imperial Government. As a condition to issuing the guarantees, Bank Melli required Itek to furnish letters of credit in its favor, issued by an American bank, with amounts and terms similar to those of its guarantees. Itek secured the five "standby" letters of credit from FNBB. Of the five, three remained outstanding as of the date Itek's complaint was filed. Their total outstanding value was $3,445,753.

In early 1979, the Iranian revolution occurred, followed, in November of 1979, by the seizing of 52 American hostages in the American Embassy in Teheran. Itek was unable to complete its performance under the contract because on April 30, 1979, the United States government cancelled its export license. Itek asserts that after the cancellation of the export license, it attempted to meet with Iranian authorities to negotiate their respective obligations under the contract. That failing, it followed the procedures specified in the contract for cancellation in the event of force majeure, which, it asserts, should have resulted in the release of all guarantees and standby letters of credit.

On January 9, 1980, Itek filed a complaint requesting that the court enjoin FNBB from honoring any demand on the letters of credit issued in favor of Bank Melli without giving Itek at least five days notice of its intent to do so. The basis for its request was its assertion that its performance on the contract had already exceeded by $9,000,000 the value of the payments it had received from Iran and its fear that unauthorized persons in Iran would make fraudulent demands for payment on the letters of credit. The court granted the request.

In February and March of 1980, Bank Melli sent FNBB telexes requesting extensions on two of the outstanding letters of credit or, in the alternative, immediate payment on the letters. Itek refused the requested extensions. On March 11, 1980, in response to an amended complaint by Itek, the court entered a Temporary Restraining Order (TRO) barring FNBB from honoring any demand on the letters of credit. On March 16, 1980, Bank Melli formally demanded payment of the letters and on March 19, 1980, Itek amended its complaint to add Bank Melli as a defendant. Itek sought a declaration that the letters of credit were null and void and a preliminary injunction barring FNBB from making payments on them. On April 14, 1980, in response to requests by Bank Melli and the United States government, the court agreed to stay the proceedings and with the consent of both defendants, ruled that the TRO would continue until further order of the court.

On January 19, 1981, the United States and the Government of Iran reached an

agreement for the release of the 52 American hostages (Hostage Agreement).[1] The United States agreed to return to Iran all Iranian financial assets under its control and to submit to arbitration by an International Arbitral Tribunal (Tribunal) claims of nationals of the United States or Iran against the other government. The United States agreed to terminate litigation in United States courts involving claims subject to arbitration under the Agreement.

Through a series of Executive Orders, Presidents Carter and Reagan implemented the Agreement. Shortly after the seizure of the hostages, in November of 1979, President Carter had issued Executive Order No. 12170, pursuant to his powers under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701 *et seq.,* blocking all property and interest in property of the Government of Iran and authorizing the Secretary of the Treasury (Secretary) to exercise all powers granted the President under IEEPA to carry out the blocking order. The Secretary of the Treasury had responded by issuing the Iranian Asset Control Regulations (Regulations), 31 C.F.R. § 535.201 *et seq.,* prohibiting the unauthorized transfer of property in which Iran had an interest. The Regulations specifically barred the entry of any final judgment which affected blocked assets, but authorized other judicial proceedings, including prejudgment attachment of Iranian assets. The Secretary made clear, however, that any license or authorization to conduct preliminary judicial proceedings could be "amended, modified or revoked at any time." 31 C.F.R. § 535.805 (1980).

On February 24, 1981, in order to implement the Hostage Agreement, President Reagan issued Executive Order No. 12294, suspending in the American courts "all claims which may be presented to the Iran-United States Claims Tribunal". He specifically excluded from the suspension order "any claim concerning the validity or payment of a standby letter of credit".

The Secretary of the Treasury amended the Regulations to implement Executive Order No. 12294. 31 C.F.R. § 535.222 was amended to provide for the suspension of all claims eligible for submission to the Tribunal, but specifically excluded claims concerning the validity or payment of a standby letter of credit. 31 C.F.R. § 535.504, which had barred the entry of any final judgment affecting blocked assets, was amended to remove the prohibition against final judgments in proceedings not suspended by § 535.222.

In January of 1981, Itek renewed its efforts to have the standby letters of credit declared null and void. Bank Melli requested a continuance, arguing that under the Hostage Agreement, all litigation between the United States and Iran should be suspended. The district court rejected that argument, noting that, whatever the merits of the dispute as to the jurisdiction of the Tribunal over claims regarding standby letters of credit, the Hostage Agreement was not self-executing and the court was therefore bound only by the President's interpretation of the Hostage Agreement and the Treasury Department's implementing regulations. The court determined that under existing Executive Orders and Treasury Regulations, there was no obstacle to its ruling on Itek's motion for a preliminary injunction, and on April 10, 1981, issued an order granting Itek's motion for a preliminary injunction.

On January 13, 1982, Itek requested a default judgment, or in the alternative, summary judgment, against Bank Melli and summary judgment against FNBB. On January 26, 1982, a Notice of Default was issued to Bank Melli for its failure to plead or otherwise defend as provided for by Fed. R.Civ.P. 55(a). On May 25, 1982, noting that Bank Melli had still failed to file an answer to Itek's complaint, and rejecting Bank Melli's numerous defenses, including improper service, lack of personal and subject matter jurisdiction, and improper venue, the court entered summary judgment

---

1. The Hostage Agreement is embodied in two Declarations of the Government of the Demo-cratic Popular Republic of Algeria, to which the President issued a "Statement of Adherence".

against FNBB and Bank Melli and permanently enjoined FNBB from honoring any demands for payment on the letters of credit. The court found both that the demands made on the letters of credit were accompanied by fraud in the transaction and that the letters had expired of their own force prior to receipt by FNBB of conforming demands.

Judgment was entered on June 1, 1982. FNBB moved to alter or amend the judgment, pursuant to Fed.R.Civ.P. 59(e), pointing to alleged inaccuracies in the district court's findings. The court denied the motion. FNBB filed a notice of appeal from the judgment and from the denial of its 59(e) motion. Bank Melli appealed from the May 25 memorandum and order and from the June 1 judgment.

On July 2, 1982, the Treasury Department again amended the Regulations. The motivating factor behind the amendment was the ongoing dispute between the United States and Iran as to whether the Hostage Agreement required that disputes regarding the validity and payment of standby letters of credit be submitted to the Tribunal. Although the United States maintained its position that the Hostage Agreement does not require arbitration of those claims, the Secretary of the Treasury indicated that a temporary ban on judgments regarding those claims was necessary to provide an opportunity for negotiations with Iran regarding the status and disposition of the claims. Section 535.222 was amended to make clear that claims concerning the validity of standby letters of credit are governed, by the general license provisions of § 535.504. Section 535.504 was amended to add a subparagraph concerning standby letters of credit. As amended, § 535.504(b)(3) read,

"(b) This section does not authorize:

(3)(i) Any final judicial judgment or order (A) permanently enjoining, (B) terminating or nullifying, or (C) otherwise permanently disposing of any interest of Iran in any standby letter of credit, performance bond or similar obligation. Any license authorizing such action is hereby revoked and withdrawn.

(ii) Nothing in this paragraph (b)(3) shall prohibit the assertion of any defense, set-off or counterclaim in any pending or subsequent judicial proceeding commenced by the Government of Iran, any political subdivision of Iran, or any agency, instrumentality or entity owned or controlled by the Government of Iran or any political subdivision thereof.

(iii) Nothing in this paragraph (b)(3) shall preclude commencement of an action for the purpose of tolling the period of limitations for commencement of such action.

(iv) Nothing in this paragraph (b)(3) shall require dismissal of any action for want of prosecution.

(v) The provisions of this paragraph (b)(3) shall expire at 11:59 p.m., on December 31, 1982."

Following the issuance of the amended regulations, the United States filed a Statement of Interest with the district court, indicating the government's position that the amended regulations should apply to judgments rendered prior to the effective date of the amendments, but not yet final because still subject to appeal. FNBB filed a Motion to Vacate Judgment and for Relief from Judgment, arguing that the amended regulations applied to its June 1 judgment. The court denied the motion, stating simply that the amended regulations were not applicable to this litigation. FNBB appealed from that denial and, by leave of this court, consolidated that appeal with the appeals from the June 1 judgment filed earlier by both FNBB and Bank Melli.

Argument was heard in this case on December 9, 1982. On December 7, 1982, the Secretary of the Treasury again amended § 535.504. The expiration date of the regulation was extended to December 31, 1983, and § 535.504(b)(3)(i) was amended to read,

"(b) This section does not authorize:

(3)(i) Any final judicial judgment or order (A) permanently enjoining, (B) terminating or nullifying, or (C) otherwise permanently disposing of any interest of Iran in any standby letter of credit, per-

formance bond or similar obligation. Any license authorizing such action is hereby revoked and withdrawn. This revocation and withdrawal of prior licenses prohibits judgments or orders that are within the terms of this subparagraph (3)(i), including any such judgments or orders which may have been previously entered but which had not become final by July 2, 1982, through the conclusion of appellate proceedings or the expiration of the time of appeal."

The Secretary also made clear, in his Supplementary Information published with the amended regulation, his intent that the amended regulation apply to judgments rendered prior to the effective date of the regulation, but still pending on appeal at that time, and cited this case as an example.

The parties have presented us with a number of issues, any one of which might be sufficient to preclude our deciding the others. If we treat the regulation barring final judgments as a jurisdictional limitation, we should address that first. Itek insists that the regulation is an unconstitutional restriction on the courts' jurisdiction. The government, however, insists that the amended regulation is not a limitation on the courts' jurisdiction, but simply a change in the substantive law governing the disposition of Iranian assets. It appears, therefore, that we must delve further into the merits of the regulation issue to determine whether we must address that issue at all.

A. *Intent of the Secretary of the Treasury for the Amended Regulation to Apply to Claims Pending on Appeal*

■ In its brief, written before the most recent clarification of the Secretary's intent regarding §' 535.504(b)(3), Itek argued, based on § 535.402 of the Regulations, that because the. Secretary had not specifically provided for the July 2 amendment to affect acts done or proceedings commenced before the amendment, the amendment could not be given such effect. Section 535.402 provides that:

"Any amendment, modification, or revocation of any section of this part or of any order, regulation, ruling, instruction, or license issued by or under the direction of the Secretary of the Treasury pursuant to section 203 of the International Emergency Economic Powers Act shall not, unless otherwise specifically provided, be deemed to affect any act done or omitted to be done, or any suit or proceeding had or commenced in any civil or criminal case prior to such amendment, modification, or revocation and all penalties, forfeitures, and liabilities under any such order, regulation, ruling, instruction or license shall continue and may be enforced as if such amendment, modification, or revocation had not been made."

As Itek points out, § 535.504, as amended on July 2, does not specifically provide for application to judgments already rendered or proceedings already commenced. Itek also points to another section of the Regulations, § 535.218, as an example by contrast of a regulation that does specifically provide for application to acts done. That section not only revokes prior licenses, but specifically bars the exercise of rights deriving from attachments made under those earlier licenses.[2]

Itek's argument, while a strong one at the time it submitted its brief, is substantially undercut by the most recent amendment to § 535.504. In that amendment, the Secretary specifically provided that § 535.-504 should apply to judgments rendered but still pending on appeal. Thus, provided that the regulation survives Itek's challenges to its constitutionality, we are constrained to apply the law as it exists now, not as it existed when the district court rendered its judgment. *See Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801) ("if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of the law, the judgment must be set aside").

---

**2.** Section 535.218 implements the Executive Order which was at issue in *Dames & Moore v.* *Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

## B. *Validity of the Regulation*

To be lawful, the regulation must be within the scope of the authority granted by Congress and must be reasonably related to the purpose for which that authority was granted. *See United States v. Yoshida International, Inc.*, 526 F.2d 560, 578–79, 582–83 (C.C.P.A.1975). It also must be consistent with the Executive Order which authorizes its promulgation. *Peters v. Hobby*, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1955); *New England Merchants National Bank v. Iran Power Generation and Transmission Co.*, 502 F.Supp. 120, 131 (S.D.N.Y. 1980). Itek challenges the regulation on all three grounds and on the additional ground that it represents an unconstitutional attempt to restrict the jurisdiction of the federal courts.

### 1. The Secretary's Authority Under IEEPA to Prevent a Transfer of Property In Which Iran Has an Interest

The Secretary's authority to issue the Iranian Asset Control Regulations derives from the President's power under IEEPA, 50 U.S.C. §§ 1701 *et seq.* That statute enables the President, during times of declared national emergency, to:

"(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities; and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;

by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1).[3]

Itek has cited a number of cases construing regulations promulgated pursuant to § 5(b) of the Trading with the Enemy Act (TWEA), 50 U.S.C.App. § 5(b), in support of its argument that a judicial declaration of rights is not a transfer of a property interest which the Secretary of the Treasury may, under IEEPA, validly prohibit. We agree with Itek that cases construing regulations promulgated pursuant to the TWEA[4] which, like the regulation at issue here, barred final judgments effecting a

3. On November 14, 1979, President Carter declared a national emergency to deal with the situation in Iran and delegated to the Secretary of the Treasury his IEEPA powers to carry out the provisions of his blocking order. President Reagan has declared the emergency situation still in effect. *See* Notice of Continuation of Iran Emergency, 47 Fed.Reg. 50841 (Nov. 10, 1982).

4. Section 5(b) of the TWEA contains language identical to that in section 1702(a)(1)(B) of the IEEPA, under which the Iranian Asset Control Regulations are promulgated. In its current form, the language of section 504 of the Iranian Asset Control Regulations is similar but not identical to section 504 of the Cuban and Vietnamese Asset Control Regulations cited by Itek. That section in the earlier regulations licensed judicial proceedings concerning blocked assets, but excluded from the license

"The entry of any judgment or of any decree or order of similar or analogous effect upon any judgment book, minute book, journal or otherwise, or the docketing of any judgment in any docket book, or the filing of any judgment roll or the taking of any other similar or analogous action."

This was also, prior to February 26, 1981, the form of section 504 of the Iranian Asset Control Regulations. That section now excludes only

"Any final judicial judgment or order (A) permanently enjoining, (B) terminating or nullifying, or (C) otherwise permanently disposing of any interest of Iran in any standby letter of credit, performance bond or similar obligation."

For our purposes, the distinction is not significant, since the issue is the same under either version of the regulation—whether any such prohibition on final judgments can validly apply to a judicial determination that there is no foreign interest in blocked property.

transfer[5] of blocked funds are relevant to a determination of the proper scope of Treasury's authority under IEEPA, see *Chas. T. Main International v. Khuzestan Water & Power Authority*, 651 F.2d 800, 809 n. 13 (1st Cir.1981), and to the proper construction of the regulations promulgated thereunder. A judgment in this case, however, unlike the "declarations of rights" found acceptable in cases cited by Itek,[6] would transfer an interest in blocked property. Regardless of the fact that the standby letters of credit have now expired, Bank Melli has, on the basis of demands made prior to that expiration, a beneficial interest in those letters of credit. That interest is more than simply a contractual right to recover from Itek the value of the letters of credit held by FNBB. It is a binding and irrevocable obligation of the bank itself, akin to a cashier's check or other negotiable instrument, to pay the value of the letters of credit on receipt of demand letters from Bank Melli. See *Leney v. Plum Grove Bank*, 670 F.2d 878, 881 (10th Cir.1982). The obligation is independent of the underlying contract and, in the absence of fraud,

Itek is powerless to prevent payment. See generally Baird, *Standby Letters of Credit in Bankruptcy*, 49 U.Chi.L.Rev. 130, 135 (1982); Note, *"Fraud in the Transaction": Enjoining Letters of Credit During the Iranian Revolution*, 93 Harv.L.Rev. 992, 1011–12 (1980). A judgment that no non-fraudulent and conforming demand was made on the letters of credit prior to their expiration would extinguish that beneficial interest and would, therefore, transfer an interest in blocked property.

2. Relationship between 31 C.F.R. § 535.504 and Congressional Purpose in Authorizing the Blocking of Foreign Assets

■ Itek argues that § 535.504 is invalid because it is not reasonably related to the purpose for which Congress authorized the President to block Iranian assets and not consistent with the Executive Orders under which it was promulgated. Thus, it argues, the regulation is beyond the scope of Treasury's delegated authority. We disagree.

On November 14, 1979, President Carter, pursuant to his authority under IEEPA and other statutes, found that the situation in

---

5. "Transfer" is defined as including "create, surrender, release, transfer, or alter" any interest in Iranian property. 31 C.F.R. § 535.310. Thus, the prohibition in § 535.504 against a final judgment permanently enjoining, terminating or otherwise permanently disposing of Iran's interest in a standby letter of credit is a prohibition against a transfer as defined by the Regulations. Given the broad authority granted the President under § 1702(a)(1)(B) of IEEPA to regulate dealings in assets in which a foreign national has an interest, Treasury's definition of transfer as including surrender or release appears to be within the scope of its delegated authority.

Earlier versions of section 504 were not, by their terms, limited to judgments effecting a transfer of assets, but it appears that courts have so construed that section. See *National Airmotive v. Government & State of Iran*, 499 F.Supp. 401, 405 (D.D.C.1980).

6. In only one of the cases cited by Itek did a court actually render a judgment declaring the rights of the parties to blocked assets. In *Tagle v. Regan*, 643 F.2d 1058 (5th Cir.1981), the Fifth Circuit rejected an argument that a state court's unlicensed probate decree, determining the rights of one Cuban and two American heirs to blocked property, effected a judicial transfer of frozen assets. "The Florida court ... did not transfer title but simple determined

claims under state law." *Id.* at 1067. While this case is similar to ours in that the Florida court's decree effectively extinguished any interest the non-American heir might have tried to assert in the two thirds of the property determined to belong to the American heirs, there is a significant difference between *Tagle* and our case. In *Tagle*, there appears to be no basis for the Cuban heir to claim any interest in the two thirds of the property to which he was found not to be entitled. In our case, however, Bank Melli has, until it is determined otherwise, a legally recognized beneficial interest in the standby letters of credit. The district court's judgment, particularly when coupled with a permanent injunction, would without any further judicial action, extinguish Bank Melli's legal interest in the letters of credit. See *Zittman v. McGrath*, 341 U.S. 446, 460, 71 S.Ct. 832, 840, 95 L.Ed. 1096 (1951) (distinction between attachment, which was acceptable, and the appointment of a receiver, which was not, was that under New York law, title to the assets vested in the receiver upon appointment). In the other cases cited by Itek, the courts have determined only that litigation could proceed, not that judgment could be rendered. See, e.g., *National Airmotive v. Government & State of Iran, supra.*

Iran constituted an unusual and extraordinary threat to the national security and declared a national emergency to deal with that threat. In Executive Order No. 12170 he

"order[ed] blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States or which are in or come within the possession or control of persons subject to the jurisdiction of the United States.

The Secretary of the Treasury is authorized to employ all powers granted to me by the International Emergency Economic Powers Act . . . to carry out the provisions of this order."

In *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1980), the Supreme Court recognized the broad scope of authority granted the President under IEEPA to control the assets of a foreign state during a national emergency. Congressional purpose in authorizing blocking orders such as that issued by President Carter is " 'to put control of foreign assets in the hands of the President' ", in part to allow him to use the assets as a bargaining chip in dealing with a hostile country. *Id.* at 673, 101 S.Ct. at 2984 (quoting *Propper v. Clark,* 337 U.S. 472, 493, 69 S.Ct. 1333, 1345, 93 L.Ed. 1480 (1949)). The Court also recognized the Executive's broad authority, under IEEPA and under his inherent power to settle claims, to nullify attachments obtained against Iranian assets since the blocking order was issued and to suspend the claims on which the attachments were based in order to submit the claims to an international claims tribunal.

The regulation at issue here, preventing a final judgment extinguishing Iran's interest in standby letters of credit, is a part of a broad regulatory scheme enacted pursuant to Executive Order No. 12170 under which the Treasury Department prevented an unlicensed transfer or other dealings in property in which Iran has an interest. 31 C.F.R. § 535.201 *et seq.* Standby letters of credit have been subject to that regulatory scheme since its initiation. *See, e.g.,* 31 C.F.R. §§ 535.508; 535.568 (1980). Thus, although final judgments in actions involving standby letters of credit were temporarily authorized,[7] standby letters of credit have, from the onset of the national emergency, been assets over which the Executive has exercised control in order to effectuate the purposes of the President's blocking order.

The acknowledged reason for the July 2, 1982 amendment to § 535.504 was the dispute between the United States and Iran as to whether the Tribunal should have jurisdiction over standby letter of credit claims and the need to preserve the status quo pending resolution of that dispute. In Executive Order No. 12294, President Reagan made clear the position of the United States that standby letter of credit claims would not be submitted to the Tribunal and therefore need not be suspended in United States courts. Although the government maintains its position that claims regarding standby letters of credit need not be submitted to the Tribunal, preservation of the status quo is not in conflict with that position. It merely puts control of the standby letters of credit in the President's hands in order to facilitate resolution of the current hitch in the implementation of the Hostage Agreement. We find this purpose fully consistent with the Congressional purpose in authorizing a Presidential blocking order and with the Executive Orders, particularly Executive Order No. 12170 and Executive Order No. 12294, pursuant to which the regulations were promulgated.

---

7. On February 26, 1981, the prohibition in section 535.504 against final judgments was removed and replaced by a regulation suspending all claims over which the Hostage Agreement granted jurisdiction to the Tribunal. Since standby letters of credit were specifically excluded from the suspended claims, courts were free, under the terms of § 535.504, which authorized judicial proceedings regarding standby letters of credit and no longer barred final judgments, to render final judgments in those cases.

**10**

### 3. Restriction of the Jurisdiction of the Federal Courts

■ Itek also claims that the regulation unconstitutionally restricts the jurisdiction of the federal courts. Whatever the authority of the Treasury Department to regulate assets in which Iran has an interest, Itek argues, neither Congress nor the Treasury may prevent a court from determining that Bank Melli's asserted interest in the letters of credit is invalid. Such a prohibition not only bars the transfer of blocked assets, but also prevents a judicial determination that the nature of the assets is such that the President may not, under IEEPA, exercise control over them. We think this is a close question. As the Court of Appeals for the Fifth Circuit has recognized, at some point the judiciary must be able to review the extent of Treasury's authority under IEEPA and to determine that certain property is beyond the reach of Treasury's asset control regulations. See Tagle v. Regan, 643 F.2d 1058 (5th Cir.1981); Real v. Simon, 510 F.2d 557, 564 (5th Cir.1975). On the other hand, courts have recognized the broad scope of authority given the President to effect policies concerning foreign assets during times of emergency, particularly when the measures taken are temporary. See Nielsen v. Secretary of Treasury, 424 F.2d 833, 842–43 (D.C.Cir.1970). This regulation does not purport to suspend entirely judicial activity regarding claims on standby letters of credit.[8] Courts may continue to hear cases regarding standby letters of credit and may issue temporary relief, including injunctions against payment on the letters of credit. The regulation merely forbids final judgments extinguishing Iranian interests in standby letters of credit and presumes, for purposes of that regulation, that a prior beneficial Iranian interest remains valid. We think that such a presumption, for the limited purpose of effectuating the blocking order, should be considered reasonable. Cf. id.

### C. Relief

The final issue before us is whether application of the regulation requires that we vacate the judgment of the district court or merely stay our own final decision. Itek reasons that the district court's judgment either did or did not finally extinguish Iran's interest in the standby letters of credit. If it did, then Treasury can exercise no further control over the assets. If it did not, then the regulation by its terms does not apply to the June 1 judgment and, at most, appellants are entitled to a stay of our own final decision.

■ Despite the initial appeal of this reasoning, we are persuaded that the regulation at issue here should be read to apply to the judgment rendered by the district court and requires that that judgment be vacated. Itek's first argument, that after the district court's judgment, Treasury could exercise no further control over the letters of credit, is undercut by the reasoning of Bradley v. Richmond School Board, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). A new law is applied on appeal because the district court's judgment is not final until the availability of appeal has been exhausted. Id. at 711 n. 14, 94 S.Ct. at 2016 n. 14. See also United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103, 109, 2 L.Ed. 49 (1801) ("[t]he last decree of an inferior court is final, in relation to the power of that court, but not in relation to the property itself, unless it be acquiesced under"). Thus, as long as there is an appeal pending, Iran's interest is not finally extinguished and Treasury may continue to exercise control over the letters of credit.

**8.** Should the President determine that disputes regarding standby letters of credit should be submitted to the Tribunal, the issue of his authority to suspend judicial proceedings regarding them will arise. We pass no judgment on whether the "power to settle claims" relied on in Dames & Moore is broad enough to cover suspension of the dispute at issue here. We do note that the standby letters of credit present a somewhat different issue in that instead of claims by United States citizens against Iran, they involve claims by Iran against United States citizens. We also pass no judgment on Itek's argument for a Fifth Amendment right to compensation should it lose in the Tribunal.

Despite the fact that the availability of an appeal means that Iran's interest has not been finally extinguished by the district court's judgment, we also reject Itek's argument that the regulation by its terms does not apply to that judgment. The regulation applies, by its terms, to "any final judicial judgment or order . . . permanently disposing of any interest of Iran in any standby letter of credit." Although the purpose behind the regulation would not be undermined by considering as not "final" and therefore not affected by the regulation a district court judgment in the process of being challenged on appeal, such a rule would inject unnecessary confusion into an already complicated regulatory system. A district court in the future, for instance, would not know whether it could render a final judgment, because, provided that the losing party appealed, such judgment would not be barred by the regulation. If no one appealed, however, its judgment, when rendered, would have been in direct violation of the regulation. Such a rule would also encourage unnecessary collateral attacks. Rather than appealing an unfavorable judgment and having the ruling against it only stayed, a losing party would be tempted not to appeal but to bring a collateral attack against the judgment as unauthorized when rendered. We conclude, therefore, that the regulation should be construed to apply to an order that is the final judgment of a court, whether or not the order is appealed to a higher court. We recognize that the effect of this ruling is to determine that the judgment of the district court was final for one purpose—application of the regulation, but not final for another—application of the *Bradley* rule, but note that a similar distinction was made by the Supreme Court in both *Bradley* and *The Schooner Peggy.* See *Bradley v. Richmond School Board, su-*

*pra,* 416 U.S. at 711 n. 14 and 722–23 n. 28, 94 S.Ct. at 2016 n. 14 and 2021–22 n. 28 (a "final judgment" precluding application of a new rule of law is "one where 'the availability of appeal' has been exhausted or has lapsed, and the time to petition for certiorari has passed"; a "final order" for purposes of the attorneys' fee statute is generally determined by appealability under 28 U.S.C. § 1291); *United States v. The Schooner Peggy, supra,* 5 U.S. at 109 ("[t]he last decree of an inferior court is final, in relation to the power of that court, but not in relation to the property itself, unless it be acquiesced under").

■ The judgment below was rightful when rendered. It is now no longer rightful and we must apply the law as if the current regulation had been in effect when the court rendered its judgment. Both the court's June 1, 1982 judgment and its May 25, 1982 order must be vacated. In so ruling, we express no opinion on the merits of the court's ruling that Bank Melli's demands for payment were nonconforming and accompanied by fraud in the transaction. Since there is no barrier to the court's issuing preliminary relief, the district court is free, on remand, to reinstate its preliminary injunction barring FNBB from making any payments on the standby letters of credit until such time as the court is free to render a final judgment on the validity of Bank Melli's demands on the letters of credit or the dispute is suspended in the courts and submitted to the Tribunal for resolution. As there is no appeal before us from the court's issuance of the preliminary injunction, we also have no occasion to pass on the court's judgment as to Itek's probability of success on the merits and its risk of irreparable harm.[9] We leave that decision to the sound discretion of the trial judge.

9. We do note that the court's earlier decision to grant preliminary injunctive relief rested in part on its conclusion that if FNBB paid on the letters of credit based on fraudulent demands by Bank Melli, Itek's only relief would be to sue the Iranian government for damages. Because the contract provided that such suit would be brought in Iranian courts it appeared that the Hostage Agreement would specifically except it from the jurisdiction of the Tribunal. In several recent decisions, however, the Tribunal has determined, despite contract provisions similar to that in Itek's contract, that it had jurisdiction over the claims. Those recent decisions are relevant to, although not determinative of, Itek's claim that it will suffer irreparable harm if payment on the standby letters of credit is not enjoined.

 We do, however, consider it appropriate to address Bank Melli's jurisdictional defenses. We affirm the holding of the district court that it has subject matter and personal jurisdiction over Bank Melli, *see Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir. 1981); that Bank Melli was properly served with process through its "Chief Agent" in New York, *see* 28 U.S.C. § 1608; and that the Ministry of War is not an indispensable party. Even if, as Bank Melli claims, Bank Melli and the Ministry of War are separate and independent entities, a judgment in this case will not prejudice Bank Melli's efforts to obtain reimbursement from the Ministry of War for funds paid on the letters of credit, nor will the Ministry of War be bound by a judgment in this case on the merits of the "fraud" issue.

*The judgment below is vacated and remanded for proceedings consistent with this opinion.*

### MEMORANDUM AND ORDER

Although petitioner's argument does not persuade us that our opinion should in any way be amended, it does suggest that we specify what kind of proceeding we had in mind for the guidance of the district court in exercising its discretion as to whether or not the preliminary injunction should be reinstated. Because there may have technically been a merger of the preliminary injunction with the permanent injunction, and because some factors bearing on the court's earlier decision to grant preliminary injunctive relief may be affected by subsequent interpretations relating to the availability of other relief, *see* p. 11 n. 9, we think the district court should exercise its discretion on reinstatement. But we do not mean to imply that petitioner must shoulder any particular burden. Nor

The court also apparently found insufficient the relief afforded by § 535.568 of the Regulations to account parties in whose name standby letters of credit have been issued. That section prohibits payment on standby letters of credit without allowing the account party the alternative of applying for a license to establish its own blocked account in the name of the Iranian entity in the amount payable under the letters

do we envisage the necessity of taking further evidence. We mean only that after the submission of appropriate legal memoranda and, if deemed by the court, argument, the court decide whether its basic presuppositions underlying its grant of preliminary injunctive relief still appear to it sufficiently valid as to warrant reinstatement.

Having so clarified our intent as to the nature of further proceedings, we deny the petition.

of credit. The court noted a dispute between the parties as to whether that provision had survived the Hostage Agreement. We are satisfied that it remains valid, *see* 31 C.F.R. §§ 535.438; 535.579(b), although there remains the risk that a Treasury license to set up the alternative account will be denied or that the Regulation will be amended.