966 F.2d 1348
 17 UCC Rep.Serv.2d 1236
 CENTRIFUGAL CASTING MACHINE CO., INC., Plaintiff-Appellee,
v.
AMERICAN BANK & TRUST CO., and Banca Nazionale del Lavoro,
Defendant-Appellee,
and
Republic of Iraq, State Machinery Trading Company, Baghdad,
Iraq, Central Bank of Iraq, and Bank of Rafidain, Defendants,
United States of America, Intervenor-Appellant.
 No. 91-5150.
 United States Court of Appeals,
Tenth Circuit.
 June 11, 1992.
 
 Douglas Letter, Appellate Litigation Counsel, Dept. of Justice, Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Tony M. Graham, U.S. Atty., Tulsa, Okl., William Hoffman and Susan Klavens Hutner, Office of Foreign Assets Control, U.S. Dep't of the Treasury, Washington, D.C., with him on the briefs), for intervenor-appellant.
 Richard A. Schneider, of King & Spalding, Atlanta, Ga., and Terry L. Weber, of Lasorsa, Weber & Miles, P.C., Tulsa, Okl., (Paul E. Swain, III, of Boone, Smith, Davis, Hurst & Dickman, and Rodney A. Edwards and Robert S. Erickson, of Jones, Givens, Gotcher & Bogan, P.C., Tulsa, Okl., with them on the brief), for Centrifugal Casting Mach. Co., Inc., American Bank & Trust Co., and Banca Nazionale Del Lavoro, plaintiff-appellee.
 Before SEYMOUR and BARRETT, Circuit Judges, and HUNTER,* Senior District Judge.
 SEYMOUR, Circuit Judge.
 
 
 1
 The United States appeals from the judgment entered in one of two consolidated diversity actions involving a letter of credit and a standby letter of credit. The letters were issued in connection with a contract between plaintiff-appellee Centrifugal Casting Machine (CCM) and State Machinery Trading Company (SMTC), an agency of the Iraqi government, under which CCM was to provide cast ductile iron pipe plant equipment to SMTC for a total contract price of $27,390,731. The contracting parties agreed that the payment mechanism from SMTC to CCM was to be an irrevocable letter of credit for the benefit of CCM in the contract amount, out of which CCM was entitled to draw ten percent as a down payment. This letter was issued by Central Bank of Iraq and confirmed by defendant-appellee Banca Nazionale del Lavoro (BNL).
 
 
 2
 The parties further agreed that a standby letter of credit in the amount of the $2.7 million down payment would be issued on behalf of CCM for the benefit of an agent of SMTC, and would be available to repay SMTC the amount of the down payment upon the requisite proof that CCM had not performed under the contract.[1] This standby letter was issued by BNL to defendant-appellee American Bank of Tulsa (ABT), CCM's bank, as account party, and made payable to Rafidain Bank, which in turn issued a $2.7 million guarantee to SMTC. CCM drew its down payment under the letter of credit and deposited that amount with ABT as security to protect ABT against any obligation it might incur on the standby letter of credit. Although an attempt was subsequently made on behalf of SMTC to draw on the standby letter of credit, the attempt was not accompanied by proof of nonperformance by CCM, and was not honored before the expiration date set out in that letter.
 
 
 3
 The suits below involved claims to the $2.7 million down payment by CCM, ABT, and BNL, the bank that had confirmed the letter of credit in favor of CCM and had issued the standby letter of credit in favor of SMTC. The United States intervened, asserting that Iraq had a property interest in the down payment and therefore in the money deposited by CCM in ABT. The United States claimed that the bank account was a blocked account under the regulations implementing the Executive Orders freezing assets of the Iraqi government.
 
 
 4
 The district court ruled that no valid draw had been made on the standby letter of credit, that this letter had expired by its own terms, and that CCM, ABT and BNL had no liability thereunder.[2] As a result of that ruling, ABT declared that it no longer claimed an interest in the $2.7 million down payment and was granted leave to interplead the amount. The remaining parties resolved their claims to this money in a confidential settlement of disputes. Accordingly, the district court dismissed their claims against each other with prejudice, released the amount from interpleader, and ordered ABT to disperse it in accordance with the settlement. In so doing, the court rejected the claim by the United States. The United States appeals, and we affirm.
 
 I.
 
 5
 Following Iraq's invasion of Kuwait on August 2, 1990, the President issued two Executive Orders blocking any transfer of property in which Iraq holds an interest. See Exec. Order No. 12,722, 55 Fed.Reg. 31,803 (1990); Exec. Order 12,724, 55 Fed.Reg. 33,089 (1990). These orders are implemented by regulations promulgated by the Secretary of the Treasury, through the Office of Foreign Assets Control. See 31 CFR §§ 575.201-.806 (1991). Under these regulations, "no property or interests in property of the Government of Iraq that are in the United States ... may be transferred, paid, exported, withdrawn or otherwise dealt in." Id. § 575.201(a).
 
 
 6
 The United States contends on appeal that the freeze of Iraq's assets furthers national policy to punish Iraq by preventing it from obtaining economic benefits from transactions with American citizens, and by preserving such assets both for use as a bargaining chip in resolving this country's differences with Iraq and as a source of compensation for claims Americans may have against Iraq. We agree that these policy considerations are compelling and that we are therefore required to construe Iraqi property interests broadly. However, we are not persuaded these policies would be furthered by construing the circumstances here to give rise to a property interest on behalf of Iraq that would not otherwise be cognizable under governing legal principles. Iraq would not be punished if denied use of an asset in which it could not claim a property interest in any event. Likewise, compensation and bargaining through use of such an asset would not be to Iraq's detriment.
 
 
 7
 We perceive the gist of the United States's argument to be that the asset at issue is a down payment Iraq made on a contract that CCM has not performed. Therefore, it is argued, Iraq has a property interest in this asset on the basis of a purported breach-of-contract claim under principles of rescission and restitution. This analysis, however, runs directly contrary to the legal principles governing the financial mechanisms chosen by the contracting parties to facilitate payments under the contract.
 
 II.
 
 8
 We begin by observing that CCM received the funds at issue by drawing on an irrevocable letter of credit. We must therefore determine the particular characteristics of that financial instrument and ascertain the nature of the interest that it conveys. Because the term "letter of credit" is not defined in either the Executive Orders or the implementing regulations, we give it the meaning ordinarily attributed to it by courts and parties dealing with this document. See Propper v. Clark, 337 U.S. 472, 480, 69 S.Ct. 1333, 1338, 93 L.Ed. 1480 (1949).[3]
 
 
 9
 "[A] letter of credit involves three parties: (1) an issuer (generally a bank) who agrees to pay conforming drafts presented under the letter of credit; (2) a bank customer or 'account party' who orders the letter of credit and dictates its terms; and (3) a beneficiary to whom the letter of credit is issued, who can collect monies under the letter of credit by presenting drafts and making proper demand on the issuer."
 
 
 10
 Arbest Const. Co. v. First Nat'l Bank & Trust Co., 777 F.2d 581, 583 (10th Cir.1985). A letter of credit thus involves three legally distinct relationships, that "between the issuer and the account party, the issuer and the beneficiary, and the account party and the beneficiary (this last relationship being the underlying business deal giving rise to the issuance of the letter of credit)." Id. In this case, CCM was the beneficiary of the letter which was issued by Central Bank of Iraq to fund the contract, BNL was the confirming bank which then became directly liable to CCM,[4] and SMTC was the bank customer or account party.
 
 
 11
 Two interrelated features of the letter of credit provide it with its unique value in the marketplace and are of critical importance in our consideration of the United States's claim here. First, "[t]he simple result [of a letter of credit] is that the issuer substitutes its credit, preferred by the beneficiary, for that of the account party." Id.; see also Republic Nat'l Bank v. Fidelity & Deposit Co., 894 F.2d 1255, 1258 (11th Cir.) (letter gives beneficiary irrevocable right to payment, not from account party, who might become insolvent or refuse to pay, but from bank), cert. denied, --- U.S. ----, 111 S.Ct. 308, 112 L.Ed.2d 261 (1990); Airline Reporting Corp. v. First Nat'l Bank, 832 F.2d 823, 826 (4th Cir.1987) (issuer replaces customer's promise to pay with its own promise to pay); Pringle-Associated Mortgage Corp. v. Southern Nat'l Bank, 571 F.2d 871, 874 (5th Cir.1978) (beneficiary's claim based on letter of credit, not on agreement between issuer and account party and not on the underlying contract). The issuing bank thus pays the beneficiary out of its own funds, and then must look to the account party for reimbursement. See generally Republic Nat'l Bank, 894 F.2d at 1257-58; Okla.Stat. tit. 12A, § 5-114(3) (issuer which has honored demand for payment entitled to immediate reimbursement).
 
 
 12
 Second, the issuer's obligation to pay on a letter of credit is completely independent from the underlying commercial transaction between the beneficiary and the account party. See Ward Petroleum Corp. v. FDIC, 903 F.2d 1297, 1299-1300 (10th Cir.1990). Significantly, the issuer must honor a proper demand even though the beneficiary has breached the underlying contract, see id. at 1299; Okla.Stat.Ann. tit. 12A, § 5-114 Okla. comment (1); even though the insolvency of the account party renders reimbursement impossible, see Wood v. R.R. Donnelley & Sons Co., 888 F.2d 313, 318 (3d Cir.1989); and notwithstanding supervening illegality, impossibility, war or insurrection, see KMW Int'l v. Chase Manhattan Bank, N.A., 606 F.2d 10, 16 (2d Cir.1979).[5] This principle of independence is universally viewed as essential to the proper functioning of a letter of credit and to its particular value, i.e., its certainty of payment. See, e.g., Ward Petroleum, 903 F.2d at 1299; Wood, 888 F.2d at 318; Tradax Petroleum Am., Inc. v. Coral Petroleum, Inc. (In re Coral Petroleum), 878 F.2d 830, 834 (5th Cir.1989); FDIC v. Bank of San Francisco, 817 F.2d 1395, 1398 (9th Cir.1987); KMW Int'l, 606 F.2d at 16. "Parties to a contract may use a letter of credit in order to make certain that contractual disputes wend their way towards resolution with money in the beneficiary's pocket rather than in the pocket of the contracting party." Itek Corp. v. First Nat'l Bank, 730 F.2d 19, 24 (1st Cir.1984); see also Ward Petroleum, 903 F.2d at 1299.
 
 
 13
 This assurance of payment gives letters of credit a central role in commercial dealings, see Bank of San Francisco, 817 F.2d at 1398-99, and gives them a particular value in international transactions, "in which sophisticated investors knowingly undertake such risks as political upheaval or contractual breach in return for the benefits to be reaped from international trade," Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana, 762 F.2d 464, 474 (5th Cir.1985). "Law affecting such an essential instrument of the economy must be shaped with sensitivity to its special characteristics." Bank of San Francisco, 817 F.2d at 1399; see Pringle-Associated Mortgage, 571 F.2d at 874. Accordingly, courts have concluded that the whole purpose of a letter of credit would be defeated by examining the merits of the underlying contract dispute to determine whether the letter should be paid. Andy Marine, Inc. v. Zidell, Inc., 812 F.2d 534, 537 (9th Cir.1987); Itek, 730 F.2d at 24 (resort to underlying contract dispute risks depriving beneficiary "of the very advantage for which he bargained, namely that the dispute would be resolved while he is in possession of the money").
 
 III.
 
 14
 Because of the nature of a letter of credit, we conclude that Iraq does not have a property interest in the money CCM received under the letter. The United States contends in essence that Iraq has a property interest in this money because it was allegedly a contract payment made by Iraq, which Iraq should recover because CCM breached the contract. In so arguing, the United States makes a breach of contract claim on behalf of Iraq that Iraq has never made, creates a remedy for the contracting parties in derogation of the remedy they themselves provided,[6] and, most importantly, disregards the controlling legal principles with respect to letters of credit.
 
 
 15
 First, the payment to CCM under the letter of credit was made not by Iraq, but by the confirming bank, BNL. Indeed, there is no way of ascertaining on the record before us whether Iraq has ever reimbursed the draw on the letter of credit, leaving open the possibility that Iraq has never actually paid out funds representing the down payment. Second, we know of no legal authority for the proposition that a potential breach of contract claim, prior to the commencement of litigation, gives a putative plaintiff a legally cognizable property interest in the assets of the putative defendant. Finally, no authority supports the argument that Iraq, as the account party on a letter of credit, has a property interest in the beneficiary's payment on the basis of the beneficiary's alleged breach of the underlying contract. To the contrary, such a holding would defeat the principle of independence universally recognized by the courts as crucial to the letter of credit's integrity as a financing device. Determining whether an account party has a property interest in a letter-of-credit payment to a beneficiary by referring to a dispute over the underlying contract is not materially different from the unacceptable practice of resorting to the contract to ascertain whether payment was proper in the first place. Reliance on the contract in either circumstance is antithetical to the unique value of the letter of credit, because certainty of payment would be undermined by concluding that the account party has a right to that payment by virtue of the underlying contract prior to litigation on that contract. The beneficiary's bargained-for right to retain the payment pending contract litigation would be effectively defeated.
 
 
 16
 The United States's reliance on Itek Corp. v. First Nat'l Bank, 704 F.2d 1 (1st Cir.1983), is misplaced because that case is factually distinguishable in significant respects. There, the court was concerned with essentially identical Executive Orders and regulations freezing the assets of Iran. Under the letter of credit at issue in that case, unlike the one here, the Iranian entity was the beneficiary of the letter rather than the account party. The court held that, under the governing principles we have set out above, Iran had a legally cognizable beneficial interest in that letter of credit. Id. at 8. The court further held that as a result of the blocking regulations, the district court could not, by ruling that Iran had made no conforming draw on the letter of credit prior to its expiration, extinguish this beneficial interest and thus "transfer" that interest to the account party. Id. at 8. The case is inapposite to the issue presented by this appeal.[7]
 
 
 17
 In rejecting the United States's position, we reiterate our recognition that blocked Iraqi property interests are to be broadly construed so as to effectuate the purposes underlying the blocking orders. We nonetheless are not at liberty to restructure the essential characteristics of a letter of credit in order to create a property interest that would not be recognized under the rules applicable to that internationally recognized financing instrument. Because those rules do not establish that Iraq has a legally cognizable property interest in the payment made to CCM under the letter of credit, the policies underlying the blocking of Iraqi assets are simply not implicated. The national interest is not furthered by creating a property interest out of conditions that would not otherwise generate such an interest, particularly when we must do so at the expense of a critical and unique device of international trade.
 
 
 18
 AFFIRMED.
 
 
 
 *
 Honorable Elmo B. Hunter, United States Senior District Judge for the Western District of Missouri, sitting by designation
 
 
 [1]
 "The essential function of [a letter of credit] is to assure a party to an agreement that he will receive the benefits of his performance." Wood v. R.R. Donnelley & Sons Co., 888 F.2d 313, 317 (3d Cir.1989)
 "A variation on this arrangement is present where, as here, the bank issues a 'stand-by' letter of credit. The beneficiary of an ordinary letter may draw upon it simply by presenting documents that show that the beneficiary has performed and is entitled to the funds. In contrast, a 'stand-by' letter requires documents that show that the customer has defaulted on some obligation, thereby triggering the beneficiary's right to draw down on the letter."
 Id.
 
 
 [2]
 This portion of the district court's ruling has not been challenged on appeal
 
 
 [3]
 We note that the parties have not addressed the law applicable to diversity actions in which the United States asserts a claim on the basis of Executive Orders implemented by federal regulations. The forum state, Oklahoma, has passed its version of the Uniform Commercial Code (UCC), see Okla.Stat. tit. 12A, §§ 1-101 to 9-507 (1981), Article 5 of which covers letters of credit, see id. §§ 5-101 to -117. The letter of credit itself expressly provides that it is subject to the Uniform Customs and Practice for Documentary Credits (1983 Revision), International Chamber of Commerce Publication No. 400 (UCP). See App. at 10. The UCP is not legislation or a treaty, but a set of rules, generally viewed as customary rules of law, that may be incorporated into the private law of a contract between parties. See (UCP) Introduction & Bibliography, 2 (1989); see also Trans Meridian Trading Inc. v. Empresa Nacional de Comercializacion, 829 F.2d 949, 954 (9th Cir.1987). We need not decide which law applies, however, because the same governing principles with respect to letters of credit are found in the law of the forum state, and in the law embodied in the UCP, either or both of which we would draw upon were we required to formulate federal common law in this appeal. See FDIC v. Bank of San Francisco, 817 F.2d 1395, 1398 (9th Cir.1987)
 
 
 [4]
 "A 'confirming bank' is a bank which engages either that it will itself honor a credit already issued by another bank or that such a credit will be honored by the issuer or a third bank." Okla.Stat. tit. 12A, § 5-103(1)(f). Here, BNL agreed to honor the credit itself. See App. at 10. "A confirming bank by confirming a credit becomes directly obligated on the credit to the extent of its confirmation as though it were its issuer and acquires the rights of an issuer." Id. § 5-107(2)
 
 
 [5]
 The UCC contains an exception for cases of fraud. See Okla.Stat. tit. 12A, § 5-114(2) (court may enjoin issuer from honoring fraudulent demand for payment). "[T]his exception must be narrowly construed or it will swallow up the rule." Ward Petroleum Corp. v. FDIC, 903 F.2d 1297, 1301 (10th Cir.1990). The United States does not contend that this exception is applicable here
 
 
 [6]
 As noted above, the parties themselves provided, through a standby letter of credit in favor of the agent of SMTC, a remedy by which SMTC could recover the down payment in the event of a breach by CCM. The parties further agreed to an expiration date for this standby letter of credit. The district court ruled that this letter expired under its own terms before a proper draw was made upon it. The United States does not appeal this ruling
 
 
 [7]
 Rather, the position of Iran in Itek is analogous to Iraq's position as beneficiary of the standby letter of credit in this case. We emphasize that the United States has not challenged on appeal the district court's ruling that any right on behalf of Iraq to payment under the standby letter of credit was extinguished when the letter expired