**SEMETEX CORPORATION and Eaton Corporation, Plaintiffs,**

v.

**UBAF ARAB AMERICAN BANK, Defendant.**

No. 93 Civ. 566 (LBS).

United States District Court, S.D. New York.

June 2, 1994.

Ross & Hardies, New York City, Philip Goldstein, Chicago, IL, Michael H. King, Kurt H. Feuer, of counsel, for plaintiffs.

King & Spalding, New York City, Michael E. Norton, Stefan W. Engelhardt, of counsel, for defendant.

## OPINION

SAND, District Judge.

Plaintiffs Semetex Corporation ("Semetex") and Eaton Corporation ("Eaton") bring this diversity action to compel payment on an international letter of credit issued by the Central Bank of Iraq and confirmed by Defendant UBAF Arab American Bank ("UBAF"). The controversy between the parties arises out of an extraordinary accident of timing—the fact that Iraq invaded Kuwait, and President Bush froze all Iraqi assets in the United States, at the very time that equipment manufactured by Eaton and procured by Semetex was en route from Austin, Texas to the purchaser in Baghdad in satisfaction of the contract underlying the letter of credit. As a result of the assets freeze, the equipment was diverted to a warehouse in Massachusetts (where it remains today), and UBAF refused to honor Plaintiffs' transport documents, which evidenced consignment of the equipment to an international carrier as the letter of credit required.

Semetex and Eaton brought this action only after applying twice for licenses from the Office of Foreign Assets Control ("OFAC"), the agency within the United States Department of the Treasury responsible for administering the Iraqi assets freeze. Plaintiffs' first attempt, an application with UBAF's consent for a license that would allow UBAF to pay Plaintiffs from its Iraqi assets, was unsuccessful. Plaintiffs' second attempt, for a narrower license allowing them to sue UBAF without OFAC's intervention, was successful, and in January 1993 Plaintiffs brought this action.

In April 1993, Plaintiffs' initial motion for summary judgment was denied. Following subsequent discovery, Plaintiffs moved again for summary judgment, and UBAF cross-moved. The cross-motions for summary judgment require us to consider the scope of the so-called "independence principle" governing documentary letters of credit, which provides that letters of credit impose obligations on participating parties independent of the contracts underlying them. In particular, the motions hinge on two issues: 1) whether Plaintiffs' recovery is barred by the Iraqi sanctions order and subsequent regulations; and 2) if not, whether UBAF has submitted evidence of fraud by Plaintiffs sufficient to excuse its obligation under the Letter of Credit. For the reasons set forth below, we answer "no" to both questions, and accordingly we grant Plaintiffs' motion for summary judgment and deny UBAF's cross-motion.

## I. FACTUAL BACKGROUND

■ On a motion for summary judgment, we must view the facts in the light most favorable to the non-moving party, and resolve all ambiguities and draw all reasonable inferences against the moving party. *Eastman Kodak Co. v. Image Technical Services, Inc.,* — U.S. ——, —— – ——, 112 S.Ct. 2072, 2076–77, 119 L.Ed.2d 265 (1992); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In this case, both parties have cross-moved for summary judgment. Since we ultimately conclude that Plaintiffs' summary judgment motion prevails, we view Plaintiffs as the moving party for purposes of the analysis that follows, and accordingly resolve all factual ambiguities and draw all reasonable inferences against them. Drawing all reasonable inferences against Plaintiffs, the essential facts are as follows.

Diversity jurisdiction in this action is uncontested. Plaintiff Semetex is incorporated under California law and has its principal place of business in California. Plaintiff Eaton is incorporated under Ohio law and has its principal place of business in Ohio. Defendant UBAF is a consortium bank organized under Article III of New York banking law and has its principal place of business in New York City.

In 1988, Semetex entered into a written technology transfer agreement with the Al–

Mansour Factory in Baghdad, Iraq ("Al–Mansour"), an enterprise owned and operated by the government of Iraq. In the contract, Semetex agreed to provide Al–Mansour with manufacturing equipment and technical services related to the upgrading of Al–Mansour's antiquated circuit-manufacturing facility. Among the required equipment was the item at issue in this dispute—an "ion implanter," a highly sensitive, custom-made piece of equipment used to mark circuitry pathways on microchips. Payment to Semetex was to be made through an irrevocable documentary letter of credit issued by an Iraqi bank and confirmed by a bank in the United States. The Central Bank of Iraq issued the letter of credit in February 1990 in the amount of $7,462,500 in favor of Semetex (the "Letter of Credit"). UBAF confirmed the Letter, which was fully collateralized by a cash deposit made by the Iraqi bank.

Semetex engaged Eaton to manufacture the ion implanter to Al–Mansour's specifications. In July 1990, with the ion implanter complete, Semetex executed an irrevocable Assignment of Proceeds directing UBAF to pay $720,000 of Semetex's first drawing on the Letter of Credit to Eaton as payment for the machine. At roughly the same time, through an agent, Semetex engaged a freight-forwarding company to ship the equipment from Eaton's factory in Austin, Texas to Baghdad. For reasons that the parties dispute, the shipment was scheduled in several stages—the initial leg was by United Van Lines from Austin to John F. Kennedy International Airport in New York, followed by a Lufthansa flight to Frankfurt and a connecting Iraqi Airways flight to Baghdad.

On August 1, with the truck carrying the ion implanter from Austin on its way to JFK, the freight forwarder hired by Semetex presented a set of transport documents to UBAF along with a drawing request for $964,640.81, representing Semetex's second attempt to obtain payment under the Letter of Credit for the ion implanter (it had tried and failed a few days earlier due to discrepancies in its documents). That night, while Semetex was awaiting payment on the Letter

of Credit and while the truck carrying the ion implanter was approaching Baltimore, Iraq invaded Kuwait. Early on the morning of August 2, President Bush issued Executive Order No. 12722, blocking Iraqi assets in the United States.

The freeze order abruptly derailed the ion implanter transaction. Eaton called United Van Lines and asked that, in order to comply with the assets freeze, the shipment be diverted to Eaton's warehouse in Massachusetts, and United complied. UBAF then refused payment on the Letter of Credit. Plaintiffs subsequently applied to OFAC for a license that would allow payment to be made from Iraqi assets. Following OFAC's denial of their application, Plaintiffs applied for a narrower license allowing them to sue UBAF without OFAC's intervention for payment from the bank's unblocked (non-Iraqi) assets. OFAC granted Plaintiffs' application, and this litigation ensued.

Most of the material facts in this dispute concern the following topics: 1) the fairly elaborate shipping arrangements for the ion implanter, arranged through several intermediaries and then abruptly interrupted by the Iraq crisis; 2) the Letter of Credit, and Plaintiffs' unsuccessful efforts to draw on it; and 3) the Iraqi sanctions regulations and Plaintiffs' license applications. These are described in turn below, with all reasonable inferences drawn in favor of UBAF.

A. *Shipment of the Ion Implanter*

Following completion of the ion implanter in June or July 1990 at Eaton's Austin factory, Eaton had the equipment picked up by Central Forwarding, an Austin moving company. Central Forwarding packaged the equipment for air transport and held it at its Austin facility pending shipping instructions from Semetex.

In order to facilitate the shipment of the ion implanter and other equipment ordered by Al–Mansour, Semetex engaged a logistics consultant, Michael Courtemanche. Courtemanche in turn engaged Alison Transport, Inc., a New York-based freight forwarder ("Alison"), to arrange shipment of the ion implanter. Robert Feldman of Alison contacted Iraqi Airways and informed a booking

agent of the proposed shipment. Iraqi Airways at that time flew into only one airport in the United States, John F. Kennedy International Airport in New York ("JFK"). Additionally, the Iraqi Airways agent informed Feldman, the ion implanter was too large to be carried on the Iraqi Airlines flight from New York. Accordingly, the agent booked the equipment on a July 29 Lufthansa flight from JFK to Frankfurt, and from Frankfurt on a connecting Iraqi Airlines flight to Baghdad.

Feldman was unable to transport the equipment from Austin to New York by air because no air carrier servicing Austin at that time flew a plane large enough to transport the ion implanter. Feldman therefore arranged for the equipment to be transported by truck from Austin to JFK Airport. Feldman scheduled the equipment to be picked up at Central Forwarding in Austin on July 26 and delivered to Lufthansa at JFK in time for the July 29 flight. When a truck arrived at Central Forwarding on July 26, however, Central Forwarding personnel declared it unsatisfactory for transporting the sensitive equipment. They informed Feldman that Central Forwarding was an agent for United Van Lines ("United"), and that United could supply an "air ride" truck which would provide a smoother ride that would be more appropriate for the job. Accordingly, Feldman arranged with Central Forwarding to have a United "air ride" truck pick up the equipment on July 31 for delivery to JFK. Feldman informed Iraqi Airways of the delay and rebooked the equipment on the Lufthansa flight scheduled to depart on August 2 for Frankfurt and to meet a connecting Iraqi Airways flight to Baghdad.

On July 31, United picked up the ion implanter at Central Forwarding in Austin and began the journey to JFK Airport. In the early morning hours of August 2, President Bush issued Executive Order 12722, freezing all Iraqi assets within the United States and prohibiting all shipments from the United States to Iraq. Upon learning of the Iraqi sanctions, Richard Landwehr of Eaton's Austin factory took steps to ensure that the shipment would not violate the Executive Order. After consulting with Eaton's head-quarters in Cleveland, Landwehr contacted Central Forwarding to find out where on its route the equipment was and whether shipment to Iraq could be prevented. After consulting with United headquarters and requesting a written request from Eaton, United ordered its driver to deliver the shipment to Eaton's factory in Beverly, Massachusetts rather than to JFK Airport. The ion implanter never reached the Lufthansa terminal, where an Alison Transport employee was waiting with the transport documents to meet the shipment. Accordingly, neither the equipment nor the transport documents were ever consigned to the possession of Iraqi Airlines or its designated carrier, Lufthansa.

Shortly after the Iraqi sanctions order was issued, Semetex sent a telex to Al–Mansour informing it that delivery of the ion implanter had been prevented by the sanctions. Al–Mansour replied by telex instructing Semetex to continue to hold the equipment until the sanctions were resolved. On or about August 6, the ion implanter was delivered to Eaton's Beverly warehouse, where it has remained in storage ever since. Eaton reported the equipment to OFAC as blocked Iraqi property owned by Al–Mansour.

### B. Compliance with the Letter of Credit

The Letter of Credit, an irrevocable documentary letter of credit, required that drawing requests be accompanied by specific documents evidencing shipment of goods by the beneficiary, Semetex, to the account party, Al–Mansour. The Letter of Credit, as amended, required that, in order to obtain payment for goods under the Letter of Credit, Semetex must, among other requirements: (1) submit to UBAF (a) commercial invoices and a certificate of origin, attested and "legalized" (that is, officially stamped); and (b) an air waybill (a type of bill of lading for shipment by air, see N.Y. U.C.C. § 1–201(6) (McKinney 1993)) evidencing air shipment, freight prepaid, from the United States to Baghdad via Iraqi Airways or carriers authorized by Iraqi Airways; and (2) send a telex cable to Al–Mansour advising Al–Mansour of the flight number and date of arrival at the Baghdad airport. Notably, the Letter of Credit did not require an "on-board" bill of

lading or other evidence that control of the ion implanter had passed to a designated carrier before payment could be made. Instead, payment was conditioned solely on Semetex's presentation of the air waybill and other documents specified by the Letter of Credit.[1]

The air waybill issued by Feldman of Alison Transport, covering the transport of the equipment from Austin to Baghdad, is at the center of the controversy between the parties. The source of the controversy, in part, is that the air waybill was created not by Iraqi Airways, the designated carrier, but by Alison Transport, Semetex's freight forwarder. A freight forwarder, a "travel agent for boxes," books space for freight shipments by its customers on carriers of commercial freight, much as a regular travel agent does with passengers. Alison was not a carrier or shipper of goods, but merely arranged transport by others. Alison was hired by, reported to, and was to be paid by Courtemanche, Semetex's logistics consultant. While Alison was not itself a carrier, though, it was authorized by Iraqi Airways to issue air waybills on its behalf, and Iraqi Airlines had issued blank air waybills to Alison Transport for this purpose.

By the time Alison presented the air waybill to UBAF, the original shipment schedule had been altered. Central Forwarding, Eaton's local freight company, had turned away the flatbed truck that arrived to pick up the ion implanter on July 26, and Feldman had scheduled a United Van Lines "air ride" truck to pick up the ion implanter on July 31 for delivery to JFK. Because of the five-day trucking delay, the original July 29 flight to Frankfurt had been rescheduled to August 2. When he prepared the air waybill, however, Feldman did not list the revised flight numbers and dates, but instead jotted down a curious amalgam. In the boxes marked "Flight/Date," he filled in "4220/31" and "232/02." Plaintiffs' Exhibit ("Pls.' Ex.") 11. "4220" apparently referred to Lufthansa flight 4220 from JFK to Frankfurt—the flight originally booked—and "232" apparently referred to the flight with which flight 4220 had been scheduled to connect, Iraqi Airways flight 232 from Frankfurt to Baghdad.

One would expect the numbers paired with these flight numbers—"31" and "02"—to refer to the dates of these flights, either before or after rescheduling, but they do not. July 31 was neither the date of the originally scheduled flight 4220 (scheduled for July 29)

---

**1.** The Letter of Credit (Defendant's Exhibit 1) is in the form of a telex cable from the Central Bank of Iraq to UBAF, dated February 5, 1990. It states in pertinent part (typographical errors reproduced as in original):

    ... WE ESTABLISH OUR IRREVOCABLE LETTER OF CREDIT NO 89/3/356 IN THEIR [Semetex's] FAVOUR FOR ACCOUNT OF AL MANSOUR FACTORY BAGHDAD UPTO THE AGGREGATE AMOUNT OGF USDOLLARS7462500/.... AVAILABLE FOR IN USA VALID UNTIL 20/3/1991
AGAINST THEIR RECEIPT OR SIGHT DRAFT DRAWN ON US ACCOMPANIED BY DOCUMENTS SPECIFIED HERE–BELOW MARKEDWITH THIS CREDIT NUMBER
1. DOCUMENTS REQUIRED
A. BENEFICIARIES SIGNED COMMERCIAL INVOICES....
B. CERTIFICATE OF ORIGIN....
C. AIRWAY [sic] BILL SHOWING PARCELS MADE OUT IN THE NAME OF OUR BANK MARKED WITH CLIENT'S NAME AND MARKED FREIGHT PREPAID
PARCELS SHOULD BEAR BUYERS NAME AND LETTER OF CREDIT NUMBER.
2. EVIDENCING IN SEVERAL LOTS OF THE FOLLOWING GOODS: TECHNOLOGY TRANSFER AND SUPPLY OF SUPPLEMENTARY PROCESS EQUIPMENT AS CONTRACT SIGNED ON 21/12/1988
3. FROM USA TO C AND F BAGHDAD BY IRAQI AIRWAYS OR CARRIERS AUTHORIZED BY IRSQI [sic] AIRWAYS NOT LATER THAN 20/11/1989 [subsequently amended to March 20, 1991]
    ....
10–TSPECIAL INSTRUCTION:
    ....
C. ON DATE OF DESPATCH THE BENEFICIARIES SHOULD CABLE BUYERS ADVISING NAME OF AIR COMPANY FLIGHT NUMBER AND EXPECTED DATE OF ARRIVAL
ALSO THEY SHOULD DIRECTLY AIR MAIL TO THE BUYERS COPIES OF THE DOCUMENTS FOR EACH SHIPMENT IN ADDITION TO THE DOCUMENTS REQUIRED UNDER THIS CREDIT.
    ....
THIS CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1983 REVISION) INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 400....

nor of the rescheduled flight from JFK (set for August 2); instead, it was the date on which the United Van Lines truck was scheduled to pick up the ion implanter in Austin. The second date—"02," apparently referring to August 2—does not, as one would expect, refer to the date of the flight number with which it is paired, 232. Flight 232 was the originally scheduled flight from Frankfurt to Baghdad. Instead, August 2 was the date of the rescheduled flight from JFK to Frankfurt. To make matters even more unclear, Feldman listed as the "airport of departure" on the air waybill not JFK Airport but Robert Mueller Airport in Austin, which was never intended to be a port of departure for the shipment. On the line reserved for the signature of the issuing carrier or its agent, the air waybill purports to show a signature, dated July 24, 1990, on behalf of "Iraqi Airways, Robert Mueller Airport, Texas"—a signature which was apparently made by a representative of Alison Transport.[2]

When the air waybill, telex, and other shipping documents were presented to UBAF for payment on July 27,[3] the bank, not surprisingly, found several internal inconsistencies and accordingly rejected the documents as not in conformity with the terms of the Letter of Credit. The most significant of these discrepancies was that between the dates of shipment listed on the air waybill and those noted in the accompanying telex. While the air waybill listed flight dates of July 31 and August 2, the telex to Al-Mansour, dated July 24 and presented to UBAF for payment on July 27, stated that the ion implanter was to be dispatched on a July 26 Iraqi Airways

flight which was scheduled to arrive in Baghdad on July 29—a flight date three days earlier than the flight originally booked and seven days earlier than the August 2 flight eventually booked from JFK.

Before presenting the document package to UBAF a second time, Alison employees revised the shipping documents to fix the internal inconsistencies that the bank had noted. In particular, Alison changed the flight dates on the air waybill (Pls.' Ex. 23) to conform to the flight dates represented in the telex—July 26 and 29—which at that time were clearly no longer accurate (if indeed they ever were). Feldman then had the document package redelivered to UBAF, along with a sight draft for $964,640.48, representing 80 percent of Semetex's charge to Al-Mansour for the ion implanter, of which $720,000 had been assigned as payment to Eaton. The bank received the documents on August 1. The parties dispute whether Courtemanche called the bank that afternoon and was informed by a UBAF employee that the documents complied with the Letter of Credit's terms and that UBAF would honor Plaintiffs' sight draft the following day.[4] The following day, of course, was too late. On August 2, UBAF telephoned Alison Transport and stated that, due to the issuance of Executive Order 12722, it would not make payment.

C. *The Iraqi Sanctions and Plaintiffs' License Applications*

Executive Order 12722 was issued by President Bush pursuant to the International

2. In explanation, plaintiffs assert that by industry usage an air waybill, unlike the typical bill of lading, does not purport to evidence actual shipment dates and locations, but instead evidences merely that the seller has fully prepaid the shipment from point of origin to final destination. UBAF contests this. Given the summary judgment posture of the case, we follow UBAF's interpretation in our description of the facts.

3. Plaintiffs assert that the documents were presented on July 26. For purposes of this motion, however, we adopt UBAF's representation that they were presented on the 27th.

4. Courtemanche testified in his deposition that he called UBAF's Letter of Credit Department between 3 and 4 p.m. on August 1 to inquire about payment of the sight draft. He testified that he was told (by a man whose voice he

recognized but whose name he did not obtain) that the documents complied with the terms of the Letter of Credit and had been accepted for payment by the bank, but that payment could not be made until the following day because it was too late in the day. UBAF, however, disputes the veracity of Courtemanche's testimony and offers in opposition an affidavit by the head of the payment section in its letter of credit department, declaring that no written record of any such communication exists in UBAF's files. Affidavit of Genaro Mesina, filed with the Court on March 22, 1993, ¶ 15. Given the summary judgment posture of this case, we must conclude that UBAF has raised a triable issue and, for purposes of this motion, conclude that UBAF made no representations about the transport documents over the telephone.

Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* (1988), among other authorities. Seven days later, in order to implement a subsequent resolution of the United Nations Security Council, S.C.Res. 661 (Aug. 6, 1990), the sanctions were modified and expanded by Executive Order 12724. Executive Order 12724, which supersedes the previous order, provides:

> Except to the extent provided in regulations that may hereafter be issued pursuant to this order, *all property and interests in property of the Government of Iraq that are in the United States* ... or that are or hereafter come within the possession or control of United States persons ... *are hereby blocked.*

Exec. Order 12724 § 1, 55 Fed.Reg. 33089 (1990) (emphasis added). Section 2 of the Order (which is still in effect, *see* Notice of the President, 58 Fed.Reg. 39111 (1993)), and regulations promulgated under the Order, prohibit a broad range of commercial activity relating to Iraq, as described in the Discussion section below.

Licenses may be obtained from OFAC on a case-by-case basis to permit certain transactions otherwise prohibited by the regulations. 31 C.F.R. §§ 575.501, .510, .801 (1993). Plaintiffs made their initial application to OFAC on May 31, 1991 for a specific license pursuant to §§ 575.510 and 575.801(b), seeking leave for UBAF to pay Plaintiffs out of funds deposited by the Central Bank of Iraq as collateral for the Letter of Credit. In connection with their application, Plaintiffs contacted UBAF regarding the bank's willingness to join in the application.

UBAF responded by letter dated March 5, 1991 from the bank's counsel, Isam Salah, stating that UBAF would assist in the license application and would sign a confirmation of facts for submission to OFAC. Plaintiffs then sent UBAF a draft license application, which contained a detailed recitation of the facts. Pls.' Ex. 28. UBAF counsel Salah responded with specific revisions (Pls.' Ex. 30) and with a separate letter, dated May 7, 1991, setting forth the facts known to UBAF (the "Confirmation Letter"). In particular, the letter confirmed that Plaintiffs' August 1, 1990 "drawing request and ... documenta-

tion satisfy the terms of the Letter of Credit." Pls.' Ex. 31, ¶ 9. After revising the license application, Plaintiffs sent it back to UBAF for an additional review. UBAF reviewed and approved the final draft for submission to OFAC, and specifically reconfirmed the May 17 Confirmation Letter and authorized its inclusion in the application. Pls.' Ex. 34. Several months later, in a letter dated August 19, 1991 responding to questions from OFAC about the application, UBAF again expressly reconfirmed its May 7 Confirmation Letter, noting in particular, "[p]lease note paragraph 9 of the Letter in which [UBAF] confirms that the drawing request satisfies the [Letter of Credit]." Pls.' Ex. 37.

On January 2, 1992, OFAC denied Plaintiffs' first license application on the ground that the Iraqi Sanctions Regulations authorize licenses only "to permit payment ... with respect to goods or services exported prior to the effective date" of the Iraqi sanctions. Pls.' Ex. 42. Since the ion implanter had not left the country by the night of August 2, 1990, when Executive Order 12722 was issued, OFAC concluded, Plaintiffs did not qualify for this exception.

On May 14, 1992, Semetex and Eaton filed their second license application with OFAC, seeking narrower relief. The second application, which was prepared without UBAF's participation, sought only a declaration by OFAC that the Iraqi Sanctions Regulations imposed no bar to a recovery by Semetex and Eaton in an action against UBAF on UBAF's contract of confirmation. The contract of confirmation, the application noted, "is backed solely by the assets of UBAF and does not—and will not—involve any blocked Iraqi funds or assets." Pls.' Ex. 43, at 1. OFAC granted Plaintiffs' second application on June 15, 1992 (the "Litigation License"). The License authorizes "[a]ll transactions ... necessary for the initiation and conduct of legal proceedings against [UBAF] to recover on UBAF's ... contract of confirmation." It states, however, that it "does not authorize ... the entry of any judgment or order that effects a transfer of blocked property." Pls.' Ex. 44.

In a follow-up letter to OFAC, Eaton and Semetex asked OFAC to clarify that the license permitted them to obtain judgment against and payment from UBAF''s unblocked assets. On July 31, 1992, OFAC issued a written clarification stating that the License did not authorize Eaton or Semetex to recover from any funds "in an account of the Government of Iraq or any of its agencies or instrumentalities," but that they "may recover ... from assets of UBAF not blocked ... under the Executive Orders and implementing Regulations." Pls.' Ex. 46. Relying on the License and OFAC's clarification, Plaintiffs brought this action.

## II. DISCUSSION

UBAF makes two arguments: A) that Plaintiffs' recovery on the contract of confirmation is barred, despite the Litigation License, by the two Executive Orders and the implementing regulations; and B) that, even if recovery is not barred by the Iraqi sanctions, it is barred by Plaintiffs' fraudulent "forging" of transport documents. As set out below, we reject both arguments.

### Standard on Summary Judgment

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and the moving party is entitled to "judgment as a matter of law." Fed.R.Civ.P. 56(c). The court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ The moving parties (Semetex and Eaton, for purposes of resolving Plaintiffs' motion) bear the initial burden of establishing the absence of material issues of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thereafter, if the non-moving party (UBAF) would bear the burden of proof on a claim or defense at trial—as UBAF would on its two affirmative defenses—the moving parties

(Semetex and Eaton) may satisfy their burden with regard to that claim or defense by demonstrating an absence of evidence to support that claim or defense. *Id.* at 325, 106 S.Ct. at 2553. To defeat the motion, UBAF must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986), but instead must point to evidence sufficient to establish each element of its defense, *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552— evidence, that is, such that a reasonable jury could return a verdict for UBAF on that defense. *Liberty Lobby*, 477 U.S. at 248–49, 106 S.Ct. at 2510; *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir.1992).

### A. The Iraqi Sanctions

■ UBAF argues that "myriad" provisions of the Executive Orders and implementing regulations bar Plaintiffs from recovering on the contract of confirmation with UBAF, and that the Litigation License provides Plaintiffs with no relief. We reject this contention, as set out below.

#### 1. The Sanctions and the Litigation License

Executive Order 12724, as noted above, provides that, except as specifically exempted by OFAC's implementing regulations, "*all property and interests in property of the Government of Iraq that are in the United States ... are ... blocked.*" Exec. Order 12724 § 1, 55 Fed.Reg. 33089 (1990) (emphasis added). UBAF argues that recovery by Eaton and Semetex on the Letter of Credit is barred by this provision as well as by several of the more specific prohibitions set out in § 2 of the Order,[5] including prohibitions on the following activities:

> (c) Any dealing by a United States person related to ... property intended for ... exportation to Iraq from any country,

---

**5.** UBAF relies as well on several provisions of Executive Order 12722, one of which, a ban on the extension of credit to Iraqi entities (§ 2(f)), is not precisely reproduced in Executive Order 12724. We do not consider this provision of the earlier Executive Order because the Order was fully superseded by Executive Order 12724. *See* Exec. Order 12724 § 6 (revoking provisions of earlier Order that are inconsistent with later Order).

or any activity of any kind that promotes or is intended to promote such dealing;

....

(e) Any transaction by a United States person relating to transportation to or from Iraq....

(f) The performance by any United States person of any contract ... in support of an industrial, commercial, public utility, or governmental project in Iraq;

(g) Except as otherwise authorized herein, any commitment or transfer, direct or indirect, of funds, or other financial or economic resources by any United States person to the Government of Iraq or any other person in Iraq ...

Recovery on the Letter of Credit or UBAF's confirmation, UBAF contends, would fall within any of these descriptions: most clearly, it would constitute "performance of a contract in support of an industrial project in Iraq" (§ 2(f)) as well as an indirect transfer of funds to an Iraqi entity (§ 2(g)).

Regulations promulgated by OFAC to implement the executive orders, codified at 31 C.F.R. Part 575 (1993) (the "Iraqi Sanctions Regulations"), expand the list of prohibited activities. These prohibitions include:

Except as authorized by regulations, ... licenses, or otherwise, *no property or interests in property of the Government of Iraq* that are in the United States ... *may be transferred, paid, exported, withdrawn or otherwise dealt in.* (31 C.F.R. § 575.-201(a) (emphasis added))

Except as otherwise authorized, no U.S. person may commit or transfer, directly or indirectly, funds or other financial or economic resources to the Government of Iraq or any person in Iraq. (*Id.* § 575.210)

The prohibition in § 575.210 applies to the unlicensed renewal of credits or loans in existence on the effective date, whether by affirmative action or operation of law. (*Id.* § 575.406(a))

No debits may be made to a blocked account [6] to pay obligations to U.S. persons

or other persons, including payment for goods, technology or services exported prior to the effective date, except as authorized pursuant to this part. (*Id.* § 575.-404)

UBAF contends that these restrictions are dispositive, particularly in light of the regulations' definition of "property" and "property interest." "Property" and "property interest," as defined by the regulations, "include, but are not limited to, ... bills of lading, ... bills of sale, any other evidences of title, ownership or indebtedness, letters of credit and any documents relating to any rights or obligations thereunder." *Id.* § 575.315. Thus, UBAF contends, the Iraqi Sanctions not only prohibit payment on UBAF's confirmation, but even prevent UBAF from dealing in the underlying documents necessary to effectuate payment on the confirmation.

We disagree. UBAF's contentions might be correct if Plaintiffs had not obtained the Litigation License before commencing this action. The License, however, removes the hurdles imposed by the Iraqi sanctions, with one important exception. The License (Pls.' Ex. 44) states in pertinent part:

SECTION 1—AUTHORIZATION: All transactions are authorized necessary for the initiation and conduct of legal proceedings against Arab American Bank ("UBAF") to recover on UBAF's ... contract of confirmation ...

SECTION 2—WARNING: This license does not authorize the transfer of any blocked property ..., the entry of any judgment or order that effects a transfer of blocked property, or the execution of any judgment against blocked property ...

As OFAC clarified in its letter of July 31, 1992, the License did not authorize Eaton or Semetex to recover from any funds "in an account of the Government of Iraq or any of its agencies or instrumentalities," such as, for instance, the account or accounts representing the Iraqi collateral which UBAF had acquired to secure its obligations under the

---

**6.** "Blocked account" is defined as "any account or property in which the Government of Iraq has an interest, and with respect to which payments ... or other dealings may not be made or effect-

ed except pursuant to an authorization or license from OFAC authorizing such action." 31 C.F.R. § 575.301.

Letter of Credit. On the other hand, the OFAC letter stated, the Litigation License *did* authorize Plaintiffs to sue UBAF and "recover ... from assets of UBAF not blocked ... under the Executive Orders and implementing Regulations." Pls.' Ex. 46. Thus, by its terms and by OFAC's explanation, the Litigation License authorized "all transactions" by Plaintiffs necessary to recover against UBAF, with the one express exception that Plaintiffs were not authorized to recover from UBAF's blocked accounts. In other words, with this one key exception, the Litigation License removed all hurdles imposed by the Iraqi sanctions orders and regulations—including, for example, its bans on contracts in support of Iraqi projects and on transfers of funds to Iraqi entities. The one question left unanswered by the Litigation License is whether recovery by Plaintiffs out of UBAF's non-Iraqi funds would constitute recovery out of blocked accounts.

Under the implementing regulations, "blocked account" and "blocked property" are defined as "any account or property in which the Government of Iraq has an interest." 31 C.F.R. § 575.301. "Government of Iraq" is defined to include instrumentalities of the Iraqi government, expressly including the Central Bank of Iraq (*id.* § 575.306(a)), and companies "substantially owned or controlled" by the Iraqi government (*id.* § 575.-306(b)), which includes Al–Mansour, an Iraqi state enterprise. *See* Defendant's Statement of Undisputed Material Facts Pursuant to Rule 3(g), ¶ 5. Thus, UBAF's argument reduces to the question: Does the Government of Iraq (including Al–Mansour and the Central Bank of Iraq) have an interest in whether Eaton and Semetex recover on the contract of confirmation against UBAF out of UBAF's non-Iraqi funds? In order to answer this question, it is necessary to address briefly the nature of documentary letters of credit.

### 2. *Letters of Credit and the Independence Principle*

■ Under New York law,[7] letters of credit are governed by N.Y. U.C.C. article 5.

Article 5, however, provides that it is superseded by the Uniform Customs and Practice for Documentary Credits (the "UCP") promulgated by the International Chamber of Commerce, in cases where a letter of credit, by its terms or by agreement, course of dealing, or trade usage, is subject to the UCP. N.Y. U.C.C. § 5–102(4) (McKinney 1991). The UCP is not legislation or a treaty, but a compilation of internationally accepted commercial practices, which may be incorporated into the private law of a contract between parties. *Alaska Textile Co. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813, 816–17 (2d Cir.1992). In this case, both the Letter of Credit and UBAF's confirmation provide expressly that they are governed by the 1983 Revision of the UCP, ICC Pub. No. 400; thus, the UCP governs both of them. *Id.; KMW Int'l v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 15 n. 3 (2d Cir.1979).

■ The basic letter-of-credit mechanism involves three or, as in this case, four parties: (1) the *customer* (or "account party"), who opens an account with (2) the *issuing bank*, which authorizes (3) the *confirming bank* to make payment to (4) the *beneficiary*, upon the beneficiary's presentation of certain documents specified in the letter of credit. *See* UCP art. 2 (1983); *Alaska Textile*, 982 F.2d at 815. In this case, the customer was Al–Mansour; the issuing bank was the Central Bank of Iraq; the confirming bank was UBAF; and the beneficiaries were intended to be Semetex and (under Semetex's assignment of proceeds) Eaton.

■ Employed frequently in international transactions, the letter of credit is a device whereby the customer and the beneficiary—who are parties to an underlying contract (generally buyer and seller respectively) but face each other over a distance—substitute the credit of the intermediate banks, one in the country of each party, for the buyer's credit. The device gives the seller (the beneficiary) immediate payment

---

7. The parties agree that New York law governs. *See* Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Mem.") at 22; Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendant's Cross–Motion for Summary Judgment ("Def.'s Mem.") at 36 n. *.

from a local bank upon shipment of the goods; merely by presenting to the confirming bank documents evidencing shipment of the ordered goods, the seller receives payment. *See Alaska Textile*, 982 F.2d at 815.

■ The central principle of letter-of-credit transactions is the so-called "independence principle": letters of credit, "by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s)." UCP art. 3; *Alaska Textile*, 982 F.2d at 815–16; *Rockwell Int'l Systems, Inc. v. Citibank, N.A.*, 719 F.2d 583, 587 (2d Cir.1983) (letters of credit "represent separate contractual undertakings that are, in legal contemplation, wholly distinct from whatever performance they ultimately secure"); *Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 682 (2d Cir.1983) (bank's obligation to the beneficiary "is primary, direct and completely independent of any claims which may arise in the underlying sale of goods transaction").

■ As is commonly noted, the parties to a letter-of-credit transaction "deal in documents, and not in goods, services and/or other performances to which the documents may relate." UCP art. 4; *Alaska Textile*, 982 F.2d at 815–16. Thus, the issuing or confirming bank must honor a proper demand even though the beneficiary has breached the underlying contract, *Centrifugal Casting Machine Co. v. American Bank & Trust Co.*, 966 F.2d 1348, 1352 (10th Cir.1992); even though the insolvency of the account party renders reimbursement impossible, *Wood v. R.R. Donnelley & Sons Co.*, 888 F.2d 313, 318 (3d Cir.1989); and notwithstanding supervening illegality, impossibility, war or insurrection, *KMW*, 606 F.2d at 16. This independence principle is universally viewed as essential to the proper functioning of letters of credit and to their particular value. *Centrifugal*, 966 F.2d at 1352. The central purpose of the letter-of-credit mechanism would be defeated if courts felt free to examine the merits of underlying contract disputes in order to determine whether letters of credit should be paid. *Id.*

### 3. *Iraq's Interest in Plaintiffs' Recovery*

This independence principle has been held dispositive of the issue before us by those few courts that have examined the issue. In the most comprehensive of these cases, *Centrifugal Casting Machine Co. v. American Bank & Trust Co.*, 966 F.2d 1348 (10th Cir. 1992), the Tenth Circuit examined a somewhat similar fact pattern also arising out of the Iraqi Sanctions Regulations. *Centrifugal* involved the claim of an American company, Centrifugal Casting, to a $2.7 million downpayment on a $27 million letter of credit issued by the Central Bank of Iraq and confirmed by Banca Nazionale del Lavoro. Centrifugal drew on the $2.7 million downpayment and deposited it in a United States bank, American Bank of Tulsa, where it became the subject of litigation with regard to a related $2.7 million standby letter of credit issued as security for the downpayment amount. Following Iraq's invasion of Kuwait and the issuing of Executive Orders 12722 and 12724, the United States intervened, asserting that Iraq had a property interest in the downpayment. *Id.* at 1349–50.

The United States argued that the $2.7 million at issue was in effect a downpayment made by Iraq on a contract that Centrifugal did not then perform, and that accordingly, Iraq had a property interest in the asset on the basis of a purported breach-of-contract claim. *Id.* at 1351. Since Iraq had a property interest in the $2.7 million, the government argued, the money was blocked by the sanctions regulations. The court of appeals rejected this analysis as "directly contrary to the legal principles governing [letters of credit]." *Id.*

■ *Centrifugal* parallels the case before us in that both cases address the scope of Iraq's property interests under letters of credit. In *Centrifugal*, the Tenth Circuit concluded that Iraq did not have a property interest in the funds at issue because of the independence of the letter of credit from the contract underlying it. *Id.* at 1353. The court stated:

[N]o authority supports the argument that Iraq, as the account party on a letter of credit [as Al–Mansour is in the case before us], has a property interest in the benefi-

ciary's payment on the basis of the beneficiary's alleged breach of the underlying contract. To the contrary, such a holding would defeat the principle of independence universally recognized by the courts.... The beneficiary's bargained-for right to retain the payment pending contract litigation would be effectively defeated.

*Id.* The right the beneficiary bargained for, the court noted, is the right to be paid not by the account party, who might become insolvent or refuse to pay, but by the bank, *out of the bank's own funds. Id.* at 1352. Thus, Iraq's interest in restitution from the bank or from the beneficiary was entirely separate from the bank's obligation to pay the beneficiary, and accordingly Iraq had no property interest in the beneficiary's recovery from the bank.

The same conclusion was reached in the other decision in which this issue was raised, a decision which, interestingly, involved a claim by UBAF similar to the one it makes now before us. In *Engel Industries, Inc. v. First American Bank,* 803 F.Supp. 426 (D.D.C.1992), as here, UBAF confirmed an Iraqi letter of credit for the benefit of an American company. The court noted that the letter of credit and the Iraqi collateral on deposit at UBAF were blocked property under the sanctions regulations. *Id.* at 427–28. The *Engel* court held, however, that "this determination does not prevent [the beneficiary] from getting a judgment against UBAF. UBAF Arab American Bank confirmed the letter of credit, meaning that it undertook liability in its own right." *Id.* at 428. The court therefore entered summary judgment against UBAF, requiring it to pay both the beneficiary and the beneficiary's assignee under its confirmation and assignment of proceeds of the Iraqi letter of credit.

We find the reasoning of both *Centrifugal* and *Engel* persuasive and UBAF's attempts to distinguish the cases unpersuasive, and accordingly we conclude that neither Al–Mansour nor the Central Bank of Iraq have a property interest in whether Eaton and Semetex recover on the contract of confirmation against UBAF out of UBAF's non-Iraqi funds. Accordingly, UBAF has failed to point to evidence sufficient to raise a triable issue regarding its Iraqi sanctions defense.

### B. *UBAF's Fraud Claim*

■ Alternatively, UBAF invokes the fraud exception to the letter-of-credit independence principle. UBAF admits that the documents presented to it on August 1, 1990 complied on their face with the requirements of the Letter of Credit. Transcript of Proceedings of April 8, 1993, at 28. It contends, however, that the documents were in compliance only because Plaintiffs misrepresented the flight information on the air waybill and forged the signature of an Iraqi Airways representative. Alison noted flight dates of July 26 and 29 on the air waybill when it made its second drawing attempt on August 1, UBAF contends, even though Alison and Plaintiffs knew that the ion implanter had only been picked up by truck in Austin on July 31 and that it was not scheduled to reach JFK Airport until August 2. UBAF contends that these discrepancies rise to the level of "outright fraudulent practice" that is required under New York law to supersede the independence principle.

Plaintiffs contest this assertion. They argue as well that UBAF, by stating and then repeatedly reconfirming that Plaintiffs' documents complied with the Letter of Credit's requirements, and by joining Plaintiffs in their initial license application, waived its right to assert a fraud defense. As described below, we conclude that triable issues of fact remain about whether UBAF waived its fraud defense with full knowledge of the material facts. We conclude, however, that UBAF has failed to present evidence of fraudulent intent motivating the discrepancies in Plaintiffs' documents. Since UBAF does not contest that Semetex's transport documents complied on their face with the Letter of Credit's terms, UBAF's failure to raise triable issues regarding fraud is dispositive.

#### 1. *Whether UBAF Waived its Fraud Claim*

Article 16 of the UCP codifies the waiver principle with respect to letters of credit. It provides that an issuing bank must examine

documents presented under a letter of credit within a "reasonable time" to determine, "on the basis of the documents alone," whether they comply with the credit's terms or whether instead they "appear on their face not to be in accordance with the terms and conditions of the credit." UCP art. 16(b), (c). If the bank decides to refuse the documents, "it must give notice to that effect without delay," and must state the discrepancies in respect of which it refuses the documents. *Id.* art. 16(d). If the bank fails to act in accordance with these provisions, the bank "shall be precluded from claiming that the documents are not in accordance with the terms and conditions of the credit." *Id.* art. 16(e); *Alaska Textile Co. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813 (2d Cir.1992); *Bank of Cochin, Ltd. v. Manufacturers Hanover Trust Co.*, 808 F.2d 209 (2d Cir.1986); *Integrated Measurement Systems, Inc. v. International Commercial Bank*, 757 F.Supp. 938, 946–48 (N.D.Ill.1991); *Kuntal, S.A. v. Bank of New York*, 703 F.Supp. 312, 314 (S.D.N.Y.1989); *Habib Bank, Ltd. v. Convermat Corp.*, 145 Misc.2d 980, 554 N.Y.S.2d 757, 758–59 (App.Term 1990).

UBAF responds, however, that article 16 applies only to nonconformance which appears *on the face* of presented documents, and so is inapplicable in cases such as this one where the beneficiary has allegedly falsified documents for the very purpose of making them conform to the terms of the letter of credit. *See Prutscher v. Fidelity Int'l Bank*, 502 F.Supp. 535, 537 (S.D.N.Y.1980) (former UCP article 8 (now article 16) does not require confirming bank to make payment on a letter of credit when the documents presented were fraudulent). UBAF's reading adheres to the text of article 16, which requires that banks make their determination of compliance "on the basis of the documents alone." UCP art. 16(b). Additionally, it does not appear to be contravened by the case law; all of the cases cited above which applied article 16 concerned documents which contained facial discrepancies. Thus, we assume that UCP article 16 provides no relief to Plaintiffs, and we examine the question of UBAF's waiver in light of the New York law of waiver.

The Second Circuit has recognized that equitable waiver principles govern letter of credit transactions under New York law. *See Alaska Textile Co. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813 (2d Cir.1992); *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir.1983). "To establish waiver under New York law one must show that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it." *Alaska Textile*, 982 F.2d at 820; *Voest–Alpine*, 707 F.2d at 685.

As an established commercial bank UBAF, we may assume, had constructive, if not actual, knowledge of its rights and obligations under letter-of-credit law. *Voest–Alpine*, 707 F.2d at 685. Additionally, at least since April or May 1991, when UBAF reviewed Plaintiffs' detailed statement of facts and responded with its own Confirmation Letter, UBAF was aware of the material facts concerning the shipment of the equipment and expressed a clear intention to support Plaintiffs' license application allowing Plaintiffs to draw payment on the Letter of Credit from UBAF's Iraqi accounts.

As described above (pp. 14–15), UBAF reviewed Plaintiffs' initial license application and issued a letter, dated May 7, 1991, confirming that Plaintiffs' August 1, 1990 "drawing request and ... documentation satisfy the terms of the Letter of Credit." Pls.' Ex. 31. UBAF then reviewed Plaintiffs' draft license application (Pls.' Ex. 28), including its detailed recitation of facts, and reconfirmed the application's accuracy as well as the accuracy of its earlier letter and joined Plaintiffs in their application. Pls.' Ex. 34. One month later, in June 1991, UBAF wrote OFAC concerning the license application. UBAF made no mention of fraud or any other objections to the application; it requested of OFAC only that it be allowed to satisfy its obligation to Plaintiffs out of its Iraqi collateral. Pls.' Ex. 36. Several months later, in an August 1991 letter to OFAC, UBAF expressly reconfirmed the accuracy of its earlier confirmation letter and once again expressed its concern that it be allowed to pay Plaintiffs out of its Iraqi

collateral. It requested that OFAC "[p]lease note ¶ 9 of the Letter in which [UBAF] confirms that the drawing request satisfies the [Letter of Credit]." Pls.' Ex. 37. It was not until after this lawsuit was filed that UBAF first raised the issue of fraud.[8]

UBAF's actions, we conclude, are strongly at odds with an intention to stand upon its right to assert a fraud defense. *See Voest–Alpine*, 707 F.2d at 685. However, since our conclusion on the waiver issue is predicated on our substantive analysis of UBAF's fraud defense, we proceed to the merits of UBAF's claim of fraud.

### 2. *"Outright Fraudulent Practice"*

■■■■ Fraud provides a well-established exception to the rule that banks must pay a beneficiary under a letter of credit when documents conforming on their face to the terms of the letter of credit are presented. *See Rockwell Int'l Systems, Inc. v. Citibank, N.A.*, 719 F.2d 583 (2d Cir.1983); *KMW Int'l v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, (2d Cir.1979); *Old Colony Trust Co. v. Lawyers' Title & Trust Co.*, 297 F. 152 (2d Cir.), *cert. denied*, 265 U.S. 585, 44 S.Ct. 459, 68 L.Ed. 1192 (1924); *United Bank Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 392 N.Y.S.2d 265, 360 N.E.2d 943 (1976); *Sztejn v. J. Henry Schroder Banking Corp.*, 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941). The exception has been codified in New York U.C.C., which provides that an issuing bank may refuse to honor documents which "appear on their face to comply with the letter of credit terms" but for which "a required document ... is *forged or fraudulent or there is fraud in the transaction."* N.Y. U.C.C. § 5–114(2) (McKinney

1991) (emphasis added). Although the UCP does not explicitly provide for a "fraud in the transaction" defense, New York law nevertheless recognizes the availability of this defense with regard to letters of credit governed by the UCP. *Rockwell*, 719 F.2d at 588; *Cambridge Sporting Goods*, 392 N.Y.S.2d at 269 n. 2, 360 N.E.2d at 946 n. 2.

■■■ The fraud defense, however, is a narrow one. *All Service Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus do Brazil, S.A.*, 921 F.2d 32, 35 (2d Cir.1990). The defense is available only where intentional fraud is shown, not where the party alleges improper performance or breach of warranty. *Id.* It does not apply, for example, to situations in which performance of the underlying contract has been interrupted by "supervening illegality, impossibility, war or insurrection." *KMW*, 606 F.2d at 16. Traditionally, it was restricted to situations in which the drafts presented under a letter of credit were forged or fraudulently procured, but the defense has gradually expanded. *Cambridge Sporting Goods*, 392 N.Y.S.2d at 270–71, 360 N.E.2d at 948. As the Second Circuit stated in *Rockwell*:

> The "fraud in the transaction" defense marks the limit of the generally accepted principle that a letter of credit is independent of whatever obligation it secures. No bright line separates the rule from the exception, to be sure, but ... "fraud" embraces more than mere forgery of documents supporting a call. The logic of the fraud exception necessarily entails looking beyond supporting documents.... [W]e must look to the circumstances surrounding the transaction and the call to deter-

---

8. UBAF argues that it did in fact raise the issue of fraud with OFAC prior to this lawsuit. However, it has submitted no evidence sufficient, in the face of Plaintiffs' countervailing evidence, to raise a triable issue of fact on the matter. The only evidence UBAF provides of its raising the issue is a brief, ambiguous reference in an August 7, 1991 letter by Plaintiffs' counsel to OFAC. The letter states that "[i]n recent communications with OFAC in which Semetex and Eaton have not participated, UBAF has apparently questioned the adequacy of the documents presented to it August 1, 1990." Defendant's Exhibit ("Def.'s Ex.") 27 at 8. Notably, UBAF does not supply any documentation of any such com-

munications. Additionally, even if UBAF did in any way question the adequacy of Plaintiffs' documents, such questioning did not lead it to abandon support for Plaintiffs' license application; on August 19, 1991 (less than two weeks after the letter on which UBAF relies), UBAF's counsel, in a letter to OFAC, reconfirmed the statements made in UBAF's May 7, 1991 Confirmation Letter and expressly drew OFAC's attention to its affirmance that "the drawing request satisfies the [Letter of Credit]." *See* Pls.' Ex. 37. We conclude that no reasonable factfinder could find that UBAF raised a meaningful challenge to Plaintiffs' Letter of Credit documents before the start of this lawsuit.

mine whether [the] call amounted to an "outright fraudulent practice."

*Rockwell,* 719 F.2d at 588–89 (citations omitted); *followed in Recon/Optical, Inc. v. Government of Israel,* 816 F.2d 854, 858 (2d Cir.1987).

The courts have found such "outright fraudulent practice" only rarely. UBAF relies in particular on two cases within this circuit in which fraud has been found, *Rockwell* and *Prutscher v. Fidelity Int'l Bank,* 502 F.Supp. 535 (S.D.N.Y.1980). *Rockwell* was one of the letter-of-credit cases to arise out of the Iranian hostage crisis and the resulting Iranian Assets Control Regulations, 31 C.F.R. part 535 (1993); *see generally* Getz, *Enjoining the International Standby Letter of Credit: The Iranian Letter of Credit Cases,* 21 Harv. Int'l L.J. 189 (1980). In these cases, United States and other western contractors had obtained the issuance of so-called "standby letters of credit" (equivalent to performance bonds) in favor of the pre-revolutionary government of Iran. These credits were issued to guarantee the contractors' performance under certain construction and supply contracts; if the contractors failed to complete performance under the contracts, the Iranian government could draw upon the credits at an Iranian bank by presenting documents evidencing the non-completion of the contracts.

After the fall of the Shah and the United States' imposition of sanctions on the new Iranian government, the western contracting parties invoked force majeure as a defense to their inability to continue to perform. In response, the Iranian beneficiaries attempted to draw on the standby letters of credit. In *Rockwell,* the Second Circuit upheld the district court's injunction against payment on the grounds of fraud. 719 F.2d at 588–89. The Second Circuit found that the call by the Iranian Ministry of Defense on a standby letter of credit did in fact amount to an "outright fraudulent practice" because Iran "first caus[ed] the default and then attempt[ed] to reap the benefit." *Id.* at 589. The court found it significant that the call was one of scores of calls that were made by the Iranian government after its actions prevented performance of large numbers of international contracts. It concluded that that circumstance "tend[ed] to support Rockwell's contention that these letters—issued to secure its 'good performance'—were called for reasons entirely unrelated to that performance and were therefore fraudulent." *Id.*

UBAF relies as well on *Prutscher,* 502 F.Supp. 535, in which Judge Bonsal upheld the right of a confirming bank to refuse to honor a letter of credit on the ground of fraud. In that case, the bank confirmed a letter of credit issued by a Lebanese bank in favor of Prutscher, as seller of certain laboratory furniture. The letter of credit required that a full set of bills of lading be presented to the issuing bank before funds could be released, showing shipment of the furniture from Italy; partial shipments were prohibited, and an expiration date was set for shipment of the furniture. Prutscher presented the bank with a bill of lading that apparently represented that the furniture was exported in one timely shipment. However, on motion for summary judgment, uncontroverted evidence was presented which demonstrated that the furniture was in fact shipped in three partial shipments, one of which sailed from Italy after the expiration date. The court granted summary judgment in favor of the bank on the basis of the evidence that the bill of lading was fraudulent. It stated:

A bank which has confirmed a letter of credit is not required to honor a draft presented thereunder if a bank receives information that a bill of lading required by the letter is forged or fraudulent and that the presenter is the original beneficiary or is otherwise chargeable with participation in the alleged fraud.

*Id.* at 536.

UBAF argues that *Prutscher* is "virtually on all fours" with the case before us. As in *Prutscher,* UBAF argues, the beneficiary (Semetex) presented a false air waybill to the confirming bank (UBAF) purporting to evidence shipment and export days earlier than in fact the shipment was scheduled. The air waybill was dated July 24 and signed by Iraqi Airways at Robert Mueller Airport in Austin, Texas, purporting to evidence consignment to that carrier on that date and a flight on July 26. In reality, by August 1,

the ion implanter had not been delivered to the designated air carrier, Lufthansa. UBAF claims that Plaintiffs "never, in fact, complied with th[e] most basic requirement of the Letter of Credit," that is, delivery of the ion implanter to the designated air carrier. Instead, UBAF claims, Plaintiffs "forged an airway [sic] bill allegedly signed by the air carrier in a fraudulent effort to obtain payment in advance of any right on their parts to be paid." Defendant's Reply Memorandum of Law ("Def.'s Reply Mem.") at 3.

Although UBAF raises evidence of substantial discrepancies between the actual facts of the ion implanter's transport and the information on Semetex's transport documents, we conclude that UBAF has not presented evidence that rises to the level of "outright fraudulent practice" described in *Rockwell* and *Prutscher*. In particular, evidence of Plaintiffs' fraudulent intent is lacking. *See All Service Exportacao*, 921 F.2d at 35 (fraud must be intentional).

UBAF has presented no evidence that, as in *Rockwell*, 719 F.2d at 589, Plaintiffs "first caus[ed] the default and then attempt[ed] to reap the benefit of the guarantee." In contrast to *Rockwell*, where the beneficiary was the very Iranian government that caused the default, the beneficiaries in the case before us, Semetex and Eaton, defaulted on their obligations on the underlying contract because of an event over which they had absolutely no control—the Iraqi assets freeze.

UBAF likewise has presented no evidence that, as in *Prutscher*, 502 F.Supp. at 536, Plaintiffs either 1) failed to comply with an explicit term of the letter of credit or 2) did so with intent to defraud. Central to the holding in *Prutscher* was the fact that one of Prutscher's shipments sailed from Italy after the letter of credit's expiration date, and that Prutscher falsified a bill of lading in order to make it appear that the ship had sailed on time so that he could obtain payment under the letter of credit. *Id.* The materiality of the misrepresentations, in other words, suggested fraudulent intent. In the case before

us, that is not the case. Unlike in *Prutscher*, UBAF has presented no evidence that Plaintiffs' alleged "forgery" of dates and a signature on the air waybill was material to the requirements of the Letter of Credit or was committed with intent to defraud.

There is no dispute that Eaton in fact manufactured an ion implanter to Al-Mansour's specifications, and there is likewise no dispute that, had it not been for the invasion of Kuwait and the subsequent Iraqi sanctions orders, the equipment would have reached its destination in Baghdad long before the Letter of Credit's revised expiration date of March 20, 1991. UBAF has presented no evidence of fraud in the five-day delay caused by the arrival of an inappropriate truck to pick up the equipment. Likewise, they have presented no evidence of fraudulent intent behind the seven-day discrepancy between the July 26 departure date represented on the air waybill and the actual planned flight date of August 2, and have presented no evidence that that discrepancy would have been material in any way in the absence of the unannounced invasion of Kuwait. Similarly, they have presented no evidence of fraudulent intent behind Plaintiffs' signing the air waybill as agents of Iraqi Airways and designating Robert Mueller Airport as the point of departure.[9]

In this regard, it is significant that the Letter of Credit did not specify that shipment in the United States must begin at Robert Mueller Airport, or otherwise specify how the equipment was to be moved within the United States. We reject UBAF's contention that Plaintiffs' efforts to transport the ion implanter from Texas to New York "are totally irrelevant to the shipment required by the express terms of the Letter of Credit," because "[i]t is the air shipment from the United States to Iraq—by Iraqi Airways or another air carrier authorized by Iraqi Airways—that is significant under the letter of Credit—not the many myriad steps that may lead up to that event." Def.'s

9. As noted above (*supra* note 2), we do not for purposes of this motion accept plaintiffs' explanation that the air waybill satisfied the terms of the Letter of Credit as understood in general trade usage. Nevertheless, UBAF does not contest that the air waybill on its face complied with the terms of the Letter of Credit, and UBAF has shown no evidence of fraudulent or ulterior motive behind Semetex's completion of the air waybill in this fashion.

Reply Mem. at 4 (emphasis added). UBAF offers no authority in support of their assertion, and we have been able to find none. To the contrary, the UCP, which by the terms of the letter of credit governs this case, does not assign significance to the date of delivery to a designated air carrier unless the parties expressly incorporate such a term into their letter of credit. Instead, unless the parties stipulate otherwise in the letter of credit, the date of shipment under a letter of credit is deemed to be the date of issuance of the transport document (here, the air waybill)—that is, the date of issuance indicated on the air waybill. UCP arts. 47(b)(ii), 50(b); [10] *and see Fertico Belgium S.A. v. Phosphate Chemicals Export Assoc.*, 100 A.D.2d 165, 473 N.Y.S.2d 403, 407–08 (App.Div.1984) (under UCP, requirement of "shipment" or "sailing" by a certain date is satisfied by issuance of onboard bill of lading bearing that date).

In sum, none of the discrepancies on which UBAF focuses would have been material to Plaintiffs' ability to draw on the Letter of Credit if the parties' plans had not been unexpectedly dashed by the invasion of Kuwait and the subsequent freezing of Iraqi assets. *Prutscher* would be analogous to this case only if Semetex had had foreknowledge of the invasion of Kuwait and the resulting freeze of Iraqi assets, and so had conspired with Alison to falsify the dates on the air waybill in order to draw on the letter of credit funds before actually shipping the ion implanter. Of course, no such evidence was presented.[11] Instead, the evidence that was submitted is closer to the facts in the New York case cited above, *Fertico*, 473 N.Y.S.2d 403, in which no fraud was found. We de-

scribe the case in some detail because its reasoning is applicable to the case before us.

As in this case, *Fertico* concerned certain discrepancies between the actual facts of shipment and the information provided on the bill of lading and confirming telex, discrepancies that the court determined did not rise to the level of fraud. The underlying contract in *Fertico* called for fertilizer to be shipped to the buyer in Antwerp. The contract did not specify an arrival date in Antwerp, but the buyer stated that time was of the essence. The letter of credit, which, as here, was subject to the UCP, specified shipment from "East or Gulf U.S. Port" to Antwerp and required an on-board ocean bill of lading "dated on-board not later than November 8, 1978" and a telex to the buyer "advising name of ship, sailing date, weight and Eta Antwerp, the same date as end of loading, and certified true." *Id.* at 405. The seller booked the cargo on a ship and issued on-board bills of lading indicating loading on November 8 (the required date). The seller also sent the buyer a telex stating that the ship sailed on November 8 and was due in Antwerp on December 4. As it happened, the ship did not in fact leave port until three days later, November 11, and did not arrive in Antwerp until December 17, 13 days later than the telex represented and apparently too late for the buyer to be able to complete a planned resale. *Id.* at 406. The seller nevertheless presented the shipping documents to the confirming bank and was paid by the bank. The buyer sued, alleging that the telex contained "fraudulent misrepresentations."

The court rejected the buyer's claim. It concluded that the discrepancy between the

10. UCP article 50(b) provides that "[t]he date of issuance of the transport document determined in accordance with Article 47(b) will be taken to be the date of shipment." Article 47(b) provides:
> For the purpose of these articles, the date of issuance of a transport document(s) will be deemed to be:
> ....
> (ii) in the case of a transport document evidencing carriage by air—the date of issuance indicated on the transport document or, if the credit stipulates that the transport document shall indicate an actual flight date, the actual flight date as indicated on the transport documents.

In the case before us, the Letter of Credit does not stipulate that the air waybill is to indicate an actual flight date (see *supra* note 1). Accordingly, we conclude that the date of issuance of the air waybill, and accordingly the date of shipment pursuant to the UCP, is the date indicated on the air waybill, July 24, 1990. Pls.' Ex. 23.

11. UBAF's counsel did, however, make an unsubstantiated allegation to this effect at oral argument but was unable to produce any evidence of such foreknowledge of the Iraqi invasion when challenged by plaintiffs' counsel. Transcript of Proceedings of Dec. 23, 1993, at 55–56.

date of the bill of lading and the date of sailing was immaterial, since under the UCP, the date of an onboard bill of lading is considered to be the date of shipment. *Id.* at 407–08. Additionally, it concluded, the ship's late date of arrival was immaterial, since the letter of credit did not specify a delivery date. *Id.* at 408. Other allegations of fraud by the buyer concerning details of the shipping arrangements (such as that the ship stopped to pick up additional cargo and then did not give priority in unloading to Fertico's cargo) were "matters totally extraneous to the text of the letter of credit and irrelevant to its interpretation." *Id.* at 407. Thus, the misrepresentations in *Fertico,* which, if anything, were more material than the evidence of misrepresentations in the case before us (given that the buyer in *Fertico* specified that the time of shipment was of the essence), were nevertheless found not to rise to the level of fraud. We conclude that UBAF likewise has raised no triable issue of fact with regard to its fraud defense.

■ UBAF raises an additional argument related to its fraud defense, which we also find to be without merit. UBAF asserts (Def.'s Reply Mem. at 6) that title and control over the ion implanter never changed hands since the shipment was never consigned to a carrier under the control of the buyer, such as Lufthansa (Iraqi Airways' designated carrier), but instead remained in the control and possession of United Van Lines, a carrier arguably acting as Plaintiffs' agent. If title did not pass, they contend, to require UBAF to honor a draw on the Letter of Credit would subject Al–Mansour to the type of risk that it expressly sought to eliminate when it specified that the ion implanter be placed in the custody of a designated carrier before the seller could draw on the Letter of Credit.

■ We agree that UBAF raises an issue of fact about whether title to the ion implanter ever passed from Semetex to Al–Mansour. However, this is not dispositive of the matter before us. Whether title and control of the equipment passed to Al–Mansour, and whether Al–Mansour successfully drafted a letter of credit that protected itself against the risks it sought to avoid, is not materially related to UBAF's duties under the Letter of Credit. Had Al–Mansour wished to assure that no draw could be made on the Letter of Credit until control of the ion implanter passed to a carrier of its choice or until air passage was under way, it could have required an "on board" bill of lading in the terms of the Letter of Credit (*see* UCP art. 27) or specified any other set of conditions that it desired. As for UBAF, its obligations under the Letter of Credit are fully collateralized by its Iraqi accounts, even if it cannot reach those accounts until the Iraqi sanctions are lifted.

The parties are thus left with the rights and obligations they bargained for: Semetex bargained for the right to be paid from UBAF's non-Iraqi assets, and UBAF attempted to protect itself against the risk of nonpayment by the Iraqi bank by fully collateralizing its obligation to Semetex. The parties having thus entered into the Letter of Credit arrangement, the material question regarding UBAF's liability is not whether control of the ion implanter had passed to Al–Mansour at the time that Plaintiffs attempted to draw on the Letter of Credit; rather, the question is whether UBAF has demonstrated either that the documents presented by Semetex failed to satisfy the Letter of Credit's terms, or that they were forged or fraudulent or there was fraud in the transaction. *Rockwell Int'l Systems, Inc. v. Citibank, N.A.,* 719 F.2d 583, 587–89 (2d Cir.1983); *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.,* 707 F.2d 680, 682 (2d Cir.1983) (bank's obligation to beneficiary "is primary, direct and completely independent of any claims which may arise in the underlying sale of goods transaction"). As set out above, UBAF admits that the documents satisfy the Letter of Credit's terms on their face, and it has failed to present evidence from which a reasonable factfinder could conclude that the fraud exception applies.

## CONCLUSION

For the reasons set forth above, we conclude that Plaintiffs have demonstrated that they are entitled to judgment as a matter of law, and that UBAF has failed to present

evidence in support of its two affirmative defenses sufficient to create a triable issue. Accordingly, we deny UBAF's cross-motion for summary judgment and grant Plaintiffs' motion, awarding judgment to Plaintiffs as a matter of law.

Plaintiffs are to submit a proposed judgment on notice.